Juan Rosario Mercado, recurrente, *v.* Comisión Industrial de Puerto Rico etc., y Secretario del Trabajo de Puerto Rico etc., recurridos.

*Número:* 574  *Resuelto:* 4 de mayo de 1962

*Francisco Colón Gordiany* y *María Valentín Collazo*, abogados del recurrente; *Arturo Estrella, Procurador General Interino* y *Genoveva R. de Carreras, Procurador General Auxiliar*, abogados del Secretario del Trabajo de Puerto Rico.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Santana Becerra y Rigau.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Al peticionario Juan Rosario Mercado le fue expedida licencia de conductor para guiar vehículos pesados de motor, en 11 de febrero de 1944, con el número 88421. Fue empleado del Gobierno de la Capital como chófer en el servicio de limpieza pública desde el año 1945 hasta el 21 de junio de 1958, fecha en que quedó físicamente incapacitado para continuar dicho trabajo.

Dicho empleado cotizó debidamente al Fondo para Seguro Social de los Chóferes, establecido por la Ley 428 del 15 de mayo de 1950 (29 L.P.R.A. secs. 681–694), mediante pagos realizados por él y su patrono hasta la fecha en que cesó en su empleo por incapacidad.

Por razón de no haber renovado su licencia, la misma fue cancelada por el Secretario de Obras Públicas en 30 de septiembre de 1954.

En 12 de agosto de 1958, el peticionario solicitó al Negociado del Seguro Social para Chóferes del Departamento del Trabajo, los beneficios de una pensión por incapacidad física a virtud del artículo 5-a de la Ley Núm. 428 de 15 de mayo de 1950, según enmendada por las leyes núms. 59 del 11 de junio de 1954 y 59 del 14 de junio de 1957. (29 L.P.R.A. sec. 686.) Igual solicitud se hizo el 13 de agosto del mismo año por su patrono, el Gobierno de la Capital.

El referido Negociado del Seguro Social para Chóferes denegó ambas solicitudes. Más tarde el Secretario del Trabajo rindió una decisión confirmando al Negociado. Dijo el Comisionado:

"No hay controversia en cuanto a si el apelante cotizó los dos años inmediatamente anteriores a la radicación de la Solicitud de Beneficio. La única cuestión envuelta en el presente caso es si una persona que ha cotizado las semanas reglamentarias al Fondo del Seguro de Chóferes tiene derecho a la compensación que fija la ley a pesar de no haber renovado su licencia de chófer y estar manejando un vehículo de motor durante todo el período de cotización en violación a la Ley de Tránsito.

"El Artículo 1 de la Ley Núm. 428 de 15 de mayo de 1950, enmendada, define lo que es un chófer, especificando que lo es 'toda persona natural autorizada de acuerdo con la ley para conducir vehículos de motor, etc. . . .' El apelante no cualifica como *chófer*, conforme a dicha definición, ya que no estaba autorizado para conducir vehículos de motor, por haber dejado caducar su licencia. Esto, ipso facto, lo excluye de los beneficios de la Ley Núm. 428. . . ." (Alegato Procurador General, pág. 2.)

El solicitante recurrió ante la Comisión Industrial y este organismo confirmó la decisión del Comisionado del Trabajo aceptando el fundamento legal expuesto por dicho funcionario en su decisión. Expedimos un auto para revisar la decisión de la Comisión.

La Ley 428 del 15 de mayo de 1950 estableció "un plan de seguridad social para los chóferes de Puerto Rico, el cual abarca los riesgos de enfermedad o incapacidad física total permanente y muerte". El artículo primero de esta ley define el término *chófer* como sigue:

"Toda persona natural autorizada de acuerdo con la ley para conducir vehículos de motor dedicados a la transportación de personas, animales o cosas mediante retribución, sueldo, jornal, paga o cualquier otra forma de compensación, ya se obtenga a base de por ciento, combinación de salario y por ciento, o combinación de salario y otras facilidades o servicios, y que conduzca dichos vehículos o su propio vehículo como su principal ocupación o modo de ganarse su sustento." (29 L.P.R.A. sec. 681.)

De suerte que para acogerse a este plan de seguridad social, la persona debe reunir los siguientes requisitos: (1) estar autorizada de acuerdo con la ley para conducir vehículos de motor; (2) que conduzca vehículos de motor dedicados a la transportación de personas, animales o cosas; (3) que por sus servicios devengue retribución, sueldo, jornal, paga o cualquier otra forma de compensación, y (4) que conduzca dichos vehículos, o su propio vehículo, como su principal ocupación o modo de ganarse su sustento. La ley, pues estableció el plan para beneficio de las personas que estando autorizadas por ley para conducir vehículos de motor, tienen como principal ocupación o modo de ganarse el sustento, la conducción de vehículos de motor mediante retribución o compensación ya fueren dichos vehículos propios o ajenos. El propósito evidente del estatuto es proteger al chófer que ha convertido la conducción de vehículos de motor en su principal ocupación o medio de ganarse el sustento. Es difícil concebir que esa protección se extendiera a las personas que conduzcan vehículos de motor en violación de la ley por no estar autorizadas para ello.

El recurrente no estuvo autorizado para conducir vehículos de motor, por lo menos desde el año 1949 en adelante. Veamos. La Ley Núm. 279 de 5 de abril de 1946 dispuso

en el inciso "(o)" de su Artículo 7 que las licencias expedidas antes de la aprobación de dicha ley se renovarían dos años después del 5 de abril de 1946 y dentro de los 60 días siguientes. Expirado dicho término de 2 años 60 días, el chófer que no hubiese renovado su licencia vendría obligado al renovarla a pagar los derechos establecidos por ley para la expedición de una nueva licencia. El recurrente no renovó su licencia ni dentro de dicho término ni posteriormente.

La Ley Núm. 16 de 5 de junio de 1948 enmendó el inciso (o) del Artículo 7 de la Ley 279 de 1946. Dispuso que a partir del 2 de enero de 1949, "toda licencia para conducir vehículos de motor en Puerto Rico deberá ser renovada en el orden que se indica más adelante, previo el pago de los derechos prescritos por ley, entendiéndose *el término de validez de las mismas es por dos años*". (Énfasis suplido.)

De acuerdo con el orden establecido para renovar las licencias expedidas antes del 11 de abril de 1946, la del recurrente debía renovarse durante el mes de septiembre de 1949. No lo hizo. Dicha ley disponía además: "Las renovaciones terminarán el día último del mes en que se especifica *desde cuya fecha se considerarán suspendidas las licencias* para las cuales no se hubiere hecho solicitud o gestión alguna para renovarlas." (Énfasis suplido.) Se concedió un término de gracia de cinco años para renovar las licencias sin el requisito de nuevo examen en un disponiéndose que lee así: "Disponiéndose, que se concede un término de gracia de cinco (5) años para mediante el pago de los derechos prescritos por ley, *poder obtener licencia* sin el requisito de nuevo examen." Se le concedió pues al recurrente hasta el año 1953 para *obtener licencia* sin el requisito de nuevo examen y tampoco lo hizo.

La Ley Núm. 217 de 9 de mayo de 1952 enmendó nuevamente el susodicho inciso (o) del Artículo 7 de la Ley 219 de 1946. Dispuso la enmienda que a partir del día 1ro. de julio de 1952 toda licencia que se expida para conducir ve-

hículos de motor en Puerto Rico será válida por cuatro años, debiendo renovarse al expirar el cuarto año dentro de 90 días previo el pago de los derechos prescritos por ley y mediante solicitud al efecto acompañada de un certificado médico creditivo de que el solicitante está capacitado física y mentalmente para conducir vehículos de motor. Se volvió a conceder un período de gracia de 5 años para renovar la licencia sin el requisito de nuevo examen. En cuanto a las licencias cuya fecha de expiración fuera después del 1ro. de julio de 1951 pero antes del 30 de junio de 1954 quedaban automáticamente prorrogadas por un término adicional de dos años. En cuanto a las licencias no renovadas y cuya fecha de expiración era antes del día 1 de julio de 1951 podían ser renovadas bajo las mismas condiciones en que eran renovadas las licencias que se expidieran a partir del día 1ro. de julio de 1952. Bajo esta ley al recurrente se le concedían cinco años más para renovar su licencia sin el requisito de nuevo examen siempre que pagara los derechos correspondientes y acompañare a su solicitud el certificado médico creditivo de su capacidad física y mental para conducir vehículos de motor, pero tampoco lo hizo. Esta ley también disponía que se consideraría suspendida toda licencia que no hubiera sido renovada dentro del término especificado por la ley. ■

De suerte que a partir por lo menos del año 1949 y hasta el año 1958, fecha de su incapacidad, la licencia del recurrente estuvo suspendida. Una licencia suspendida, no le autorizaba a conducir vehículos de motor. Una interpretación contraria sería atribuirle al legislador la aprobación de disposiciones vacuas, inútiles y sin ningún significado. Pero es que el contexto de las leyes que estamos examinando, no permiten atribuirle al legislador haber legislado sin sentido. Por ejemplo, la Ley 16 de 1948 al disponer el orden para la renovación de licencias declaró que el término de validez de dichas licencias era por dos años. Es decir, las licencias renovadas oportunamente tenían validez por dos

años. ¿Podían tener validez alguna las licencias no renovadas? Claro que no. Por el contrario dicha ley lo que dispuso fue que las licencias no renovadas quedarían suspendidas. Es decir, el permiso que implica la expedición de una licencia quedaba suspendido, y por tanto el poseedor de tal licencia suspendida, no estaba autorizado por ley para conducir vehículos de motor en el entretanto. Cuando esa ley concede el período de gracia de 5 años en el "disponiéndose" que hemos copiado anteriormente, dice que dicho período es para *poder obtener licencia* sin el requisito de nuevo examen. Si realmente la licencia suspendida le autorizaba a conducir vehículos de motor, ¿por qué dice el legislador "para poder obtener licencia"? Pues lo dice porque una licencia suspendida, a los fines de la autorización que dicha licencia concede, equivale a no tener licencia. ■

La Ley 217 de 1952 dio validez por cuatro años a las licencias expedidas a partir del 1ro. de julio de 1952. Si no se renovaba dentro de los 90 días después de haber expirado el cuarto año, la licencia carecía de validez. Esa es precisamente la naturaleza de una licencia suspendida, carece de validez. Ello implica necesariamente que el tenedor de la licencia suspendida, que es una licencia sin validez, no está autorizado para conducir vehículos de motor y para que esto sea así era innecesario que el Secretario de Obras Públicas, en el supuesto de que tuviera autoridad para ello, cancelara la licencia suspendida. En igual situación se encontraban las licencias cuya fecha de expiración era antes del día 1ro. de julio de 1951. La del recurrente había expirado desde que venció el término concedido para la renovación por la Ley 279 de 1946. ■

Es cierto que el recurrente ni su patrono ni ninguna autoridad le llamó la atención sobre las disposiciones legales aquí comentadas, pero ese hecho no excusa el incumplimiento de la ley. ■

Puede ocurrir, como en el caso de autos, que una persona cotice al Fondo por estar empleado en la conducción de vehículos de motor mediante paga, sin ser un chófer, tal como lo define la ley, o sea, sin estar autorizado por ley para conducir vehículos de motor. Aunque haga los pagos de cotización correspondientes, esa persona, por no ser *un chófer*, según se define dicho término en la ley, no podría acogerse a los beneficios del plan. Los pagos hechos por el aquí recurrente, constituyen una irregularidad. No eran pagos autorizados por la ley.

Al enmendarse la Ley Núm. 428 de 1950 por la Núm. 59 de 14 de junio de 1957, se dispuso en el artículo 9, inciso (c) (Disposiciones sobre la Administración del Plan) que el Secretario del Trabajo "podrá denegar los beneficios que concede esta ley a cualquier chófer o a sus beneficiarios cuando determine mediante una investigación que las cotizaciones acreditadas que darían derecho a tal beneficio, fueron pagadas apartándose de las disposiciones que rigen su procedimiento de pago o que el pago de la cotización se hizo después del chófer tener conocimiento de que no se encontraba bien de salud. En tales casos se procederá a devolver la cotización así pagada".

La Comisión del Trabajo del Senado, al proponer que se aprobara una enmienda al artículo 9 que comentamos, se expresó así: "Las enmiendas a los incisos (a), (b) y (c) del Artículo 9 son más bien de carácter aclaratorias. Se establece de manera concluyente que *no podrán pagarse cotizaciones en violación de las disposiciones de la ley*, evitándose especialmente el que un chófer que sabe que está enfermo cotice al Fondo para tener derecho al pago de beneficios. Se dispone que cuando esto ocurra, se habrán de devolver al chófer las cotizaciones que haya pagado." Tomo III, Vol. IX, pág. 1147, Diario de Sesiones de la Asamblea Legislativa de Puerto Rico. (Énfasis suplido.) ■ ▪

De todo lo expuesto puede deducirse que los pagos de cotizaciones hechos al Fondo por un chófer no autorizado para conducir vehículos de motor, son pagos de cotizaciones en violación de la ley, que sólo permite tales pagos a los beneficiarios del plan, o sea, a los choferes, según éstos se definen en el artículo 1 de la Ley 428 de 1950.

El recurrente en este caso cumple con todos los requisitos exigidos por la ley para tener derecho a los beneficios del Plan, excepto el de ser un *chófer* tal y como este término se define en la ley. El no ser *chófer*, le impedía cotizar legalmente al Fondo para Seguro Social de los Choferes. Las cotizaciones que le fueron acreditadas no están autorizadas por ley. El no cualificaba para cotizar ni podía acogerse a los beneficios del plan creado por la Ley 428 de 1950. Por tanto, su derecho se limita a recibir el reembolso de tales cotizaciones.

*Se confirma la Resolución dictada por la Comisión Industrial en 22 de julio de 1959.*

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA disintió por opinión separada.

————

Opinión disidente emitida por el Juez Asociado Señor Santana Becerra.

Disiento en este caso por entender que el Secretario del Trabajo al denegar al chófer peticionario los beneficios a que era acreedor bajo la Ley de Seguro Social para Choferes, y la Comisión Industrial al confirmar dicha denegatoria, actuaron haciendo uso de facultades y atribuciones que no les concede la Ley para tales casos. Un historial de todo el asunto, para empezar por su principio, es el siguiente:

Al peticionario se le expidió licencia en el año 1944. La obligación de renovar las licencias para conducir vehículos de motor se dispuso en el inciso "(o)" del Art. 7 de la Ley de Automóviles y Tránsito, Ley Núm. 279 de 5 de abril de 1946.

Las licencias expedidas antes de dicha Ley 279 se renovarían dos años después del 5 de abril de 1946 y dentro de los 60 días siguientes. Expirado ese término de 2 años 60 días, el chófer que no hubiere renovado vendría obligado al renovar a pagar los derechos de una nueva licencia. Ninguna sanción se dispuso sobre suspensión o cancelación de la licencia, o sobre prohibición de manejar. Bajo el inciso (a) del propio Art. 7 sólo se prohibía manejar a aquella persona a quien no se le hubiere *expedido* una licencia.

El 5 de junio de 1948, al vencerse el término de 2 años y 60 días antes dicho, entró en vigor la Ley 16 enmendatoria del inciso "(o)", disponiendo fechas en que las licencias expedidas con anterioridad a la Ley 279 serían renovadas. La del peticionario, por su número, debía renovarse durante el mes de septiembre de 1949. Ahora se proveyó que la licencia quedaría *suspendida* pero no se alteraron las disposiciones del inciso (a). Además, se concedió un término de gracia de 5 años para que, mediante el pago de los derechos prescritos por ley, se pudiera renovar licencia sin el requisito de nuevo examen.

El 9 de mayo de 1952 entró en vigor la Ley 217 que enmendó de nuevo el inciso "(o)", disponiéndose que a partir del 1ro. de julio de 1952 toda licencia sería válida por cuatro años y debía ser renovada dentro de 90 días a contar de la fecha de su vencimiento previo el pago de los derechos prescritos por ley, acompañándose un certificado médico acreditativo de que el solicitante estaba capacitado física y mentalmente para conducir vehículos de motor. Pasados los 90 días se podía no obstante renovar la licencia dentro de un período de 5 años, pagándose los derechos prescritos por ley como en el caso de una solicitud para obtenerla por primera vez, sin el requisito de un nuevo examen. Se dispuso además en esta ley *que toda licencia no renovada cuya fecha de expiración era antes del 1ro. de julio de 1951 podía ser renovada bajo las mismas condiciones anteriormente dichas, y se man-*

tuvo la disposición de que una licencia no renovada se consideraría suspendida. El inciso (a) del Art. 7 tampoco fue alterado en esta ocasión. Por la Ley 50 de 8 de junio de 1954 se enmendó el inciso (a) para incluirle unas penalidades específicas, pero su texto original quedó igual o sea que quedaba prohibido el manejo de vehículos de motor a aquellas personas a quienes no se les hubiere *expedido* licencia.

Por lo menos hasta la Ley 217 de 1952 en que se exigió acompañar un certificado médico para renovar las licencias, la renovación aparentemente no tenía ningún otro propósito que el de allegar fondos y no guardaba relación alguna con la aptitud o condición de la persona para guiar. De acuerdo con la Ley 279 el dinero recaudado por la renovación de las licencias iba a un fondo especial para estudio, construcción, etc. de carreteras. Por la Ley 227 de 15 de mayo de 1948 se dispuso que un 50% del importe pagado por la renovación de la licencia dispuesta en el inciso "(o)" del Art. 7 ingresaría en un fondo especial que desde ese entonces denominaron "Fondo para el Seguro Social de los Choferes Públicos de Puerto Rico", para ser destinado a los fines y propósitos que por ley se proveyera. Cuando esto, la ley creando el Seguro Social de Choferes aún no se había aprobado. La misma situación mantuvo la Ley 116 de 26 de abril de 1949, pero por la número 33 de 20 de marzo de 1951 lo pagado por renovación de las licencias ingresa en los fondos generales del Tesoro, o sea se lo quitan al Fondo para el Seguro Social de Choferes a pesar de que ahora sí existía por ley creado ese fondo. No podría decirse, por lo tanto, que un chófer que dejara de renovar su licencia en alguna forma hería o le creaba perjuicio a su propio fondo de seguro.

He hecho la anterior reseña de la legislación para situar en la perspectiva adecuada las actuaciones del Secretario del Trabajo y de la Comisión recurrida. Sabemos de las hondas preocupaciones de nuestra Asamblea Legislativa sobre los problemas del tránsito y la conducción de vehículos de motor.

Pero cuando en 15 de mayo de 1950 y por la Ley 428 creó
el Seguro Social para Choferes, le proveyó fondos con apor-
taciones de los choferes y de los patronos, y estableció todo
un sistema, eran otras, de cierto, las preocupaciones de la
Asamblea Legislativa.    En ese momento no tenía en mente
los problemas del tránsito y sí los problemas sociales que
quiso resolver con esta legislación.    Por eso entiendo que no
era de la particular incumbencia y preocupación del Secre-
tario del Trabajo como administrador de este sistema, ni de
la Comisión Industrial al revisarlo, el negarle el seguro al
peticionario quien bajo esta legislación había cumplido con
todos los requisitos para poder recibirlo, por el hecho de que
este chófer hubiera incurrido en una violación de la ley de
automóviles que de acuerdo con esta misma ley no surtía el
efecto de que el peticionario no fuera un chófer a quien se
le hubiera autorizado para conducir vehículos de motor.
Véase el inciso (a) del Art. 7 de la Ley 279 según fue en-
mendado.    Al crearse el 15 de mayo de 1950 este sistema
de seguro social, la situación del peticionario en ley era la de
una persona autorizada para conducir vehículos de motor
cuya licencia estaba suspendida pero no cancelada ni anulada.
Aún más, cualquier incumplimiento suyo al no renovar en
septiembre de 1949 quedó obviado por el propio Legislador
en la disposición transcrita de la Ley 217, ante.

He aquí la situación según se expone en la decisión del
Secretario del Trabajo.    En 13 de agosto de 1958 el peticio-
nario solicitó los beneficios del seguro de choferes por inca-
pacidad física total permanente.    Desde el 9 de julio de 1958
se hallaba imposibilitado para conducir vehículos de motor
según certificación médica, por razón de cardiopatía por ar-
teriosclerosis con insuficiencia cardiaca y arteriosclerosis
generalizada.    En cuanto a la incapacidad del obrero no sur-
gía controversia ni tampoco en cuanto a que cotizó por el
tiempo reglamentario que exige la ley, expresando el Secre-
tario que la única cuestión envuelta era si una persona que

había cotizado las semanas reglamentarias al Fondo tenía derecho a la compensación de esa ley a pesar de no haber renovado su licencia de chófer y estar manejando un vehículo de motor en violación de la ley de tránsito. Resolvió negarle la compensación porque su licencia había sido *cancelada* en 30 de septiembre de 1954 por no haberla renovado—[en cuanto a la inexistencia de esta cancelación me referiré más adelante] —y él no cualificaba como chófer porque había estado manejando sin autorización y esto *ipso facto* lo excluía de los beneficios de la Ley 428.

Hay prueba en el expediente de la Comisión recurrida de que el Gobierno de la Capital cotizó como patrono al Fondo en cuanto a este obrero desde septiembre 23, 1950 hasta agosto 28, 1954 y desde septiembre 4, 1954 hasta septiembre 26, 1958, con excepción de unas semanas. El peticionario cotizó desde diciembre, 1950. El Negociado de Seguro Social concedió al peticionario beneficios por enfermedad durante períodos en los años 1953, 1954, 1955, 1957, del 27 al 30 de mayo y del 16 de julio al 8 de agosto de 1958.

Unida al expediente hay una certificación del Departamento de Obras Públicas fechada 22 de junio de 1959 haciendo constar que el peticionario no está autorizado para guiar, poseía licencia de conductor de vehículos pesados número 88421 expedida en febrero 11, 1944 y que "esta licencia *quedó* cancelada en septiembre de 1954, por no haber sido renovada." Antes de seguir adelante quiero expresar que ese documento no certifica *un hecho*—al peticionario no se le canceló la licencia—sino una conclusión legal de que *quedó* cancelada, por cierto errónea, del funcionario que la expidió y que no tiene otro efecto en la evidencia que el de una mera opinión interpretativa. Fue errónea y no autorizada por ley dicha conclusión primero, porque la Ley 279 de 1946 según fue enmendada no concedía facultad al Departamento de Obras Públicas para cancelar licencias *administrativamente*, residiendo dicha facultad únicamente en las cortes—Art. 18.

Segundo, porque de acuerdo con las disposiciones legales anteriormente transcritas, la licencia no renovada tenía en ley la condición de suspendida. Si se renovaba después de 90 días sin que hubiera transcurrido el período de cinco años había que pagar derechos como si se tratara de la licencia original. Después del período de cinco años había en adición que tomar el examen. Esas eran las sanciones civiles de la ley por no renovar. La única actuación autorizada al Secretario de Obras Públicas, bajo el propio inciso "(o)" del Art. 7, era el *denegar* la renovación de una licencia cuando a su juicio el tenedor constituia una *amenaza para la seguridad pública;* y disponía el inciso (p) que se consideraría *nula* desde la fecha de su expedición toda licencia *obtenida* por un solicitante mediante *informes falsos.* Ninguna disposición de la Ley concedía facultad al Secretario de Obras Públicas para cancelar una licencia definitivamente por razón de que no hubiera sido renovada y menos a espaldas del interesado y sin ser notificado ni oído según surge del récord. En su declaración ante la Comisión el peticionario quien demuestra ser persona de poca capacidad mental, declaró que en todo el tiempo en que estuvo trabajando con el Gobierno de la Capital desde 1945 como conductor de los camiones de la limpieza nunca se le informó por persona o entidad alguna nada relacionado con la renovación de la licencia. [1]

La Comisión recurrida basó su fallo en la premisa legal:— (1) que el Art. 1 de la Ley 428 de 1950 creando el sistema de seguro define "chófer" como una persona natural autorizada de acuerdo con la ley para conducir vehículos de motor

---

[1] Bajo la Ley 95 de 29 de junio de 1954 y como parte de todo el trámite establecido relacionado con la conducción en estado de embriaguez, se autorizó al Secretario de Obras Públicas al recibir declaraciones de un juez, a suspender primero, y previa audiencia a cancelar después, licencias de personas acusadas de haber estado conduciendo en estado de embriaguez cuando él concluia que no hubo justificación para no someterse a los exámenes de laboratorio provistos. La cancelación era provisional excepto en caso de reincidencia. Esta ley no tiene aplicación alguna al caso de autos.

dedicada a la transportación de personas, etc. . . . y que conduzca dichos vehículos o su propio vehículo como su principal ocupación o modo de ganarse su sustento; (2) que al cancelársele la licencia al peticionario [cancelación que fue inexistente tanto de hecho como de derecho] el peticionario violaba la ley de automóviles al conducir en el curso de su trabajo y este hecho era *"suficiente para excluirlo"* de los beneficios; (3) que al pagar sus cuotas realizaba un acto sin consecuencias jurídicas y el hecho de que cotizara no lo ponía dentro del marco del sistema.

Bien frágiles son esas premisas legales para basar la acción tomada. El Art. 1 de la Ley 428 no tenía otro propósito sino el estatuir cuál trabajador pertenecería a este sistema, el chófer a distinción del plomero, del carpintero, etc., y aquel chófer que condujera vehículos como su *principal ocupación* o modo de ganarse su sustento. Esto último era lo esencial a los fines de esta legislación. El que estuviera autorizado estaba sobreentendido, y aunque la ley no lo hubiera expresado, habría así que asumirse. Una vez que el peticionario vino a formar parte del sistema habiendo debidamente cualificado, el Secretario del Trabajo estaba sólo facultado a negarle sus derechos o beneficios dentro del sistema por las razones que la propia Ley 428 establece, y no por otras.

Según expresé en mi opinión en *Alers* v. *Tribunal Superior*, 83 D.P.R. 701, 709, y repito ahora con mayor razón de ser, éste es un problema serio del funcionamiento administrativo que requiere un poco de cuidadoso análisis. Hasta qué punto una agencia a quien la Asamblea Legislativa ha encomendado la tarea de administrar una legislación que lleva determinados fines y propósitos sobre todo esta social de fines reparadores puede, en su función judicial o cuasi judicial, *en ausencia de disposición de ley*, negar derechos por consideraciones que no son las expuestas en esa legislación a base del incumplimiento de otros estatutos. Como expresé

en *Alers,* cuando el Legislador ha querido que así sea, que una legislación sirva el propósito a la vez de hacer más efectivo el cumplimiento de otra, así lo ha dispuesto. Me referí (escolio 1 de mi opinión en ese caso) a algunos ejemplos, y típica es la ilustración que ofrece el Art. 11 de la Ley 130 de 1945 sobre Relaciones del Trabajo. Por ejemplo, la Ley 85 de 14 de junio de 1960 dispuso para hacer más efectivo el cumplimiento por el patrono de la Ley 428 que crea este seguro, que los casos de empresas de servicio público en que se hubiera dictado sentencia por no cumplir con la obligación de cotizar serán notificados a la Comisión de Servicio Público para que ésta les dé la debida consideración cuando dichas empresas acudieren ante ella en trámites relacionados con sus certificados de necesidad y conveniencia.

Si el Legislador hubiera querido castigar o sancionar a los choferes por el incumplimiento o violación de las disposiciones de las leyes de tránsito negándoles sus derechos bajo el sistema, lo hubiera así dispuesto. Hubiera dicho que a ningún chofer que al momento de ser acreedor a un beneficio se hallare en violación de la ley de tránsito, o tuviere su licencia suspendida o temporal o permanentemente revocada, podría concedérsele dichos beneficios. La prueba que menciona el Art. 5 (A) (ahora 5) en casos de incapacidad total permanente, tiene el propósito de informar al Secretario del Trabajo que el Departamento de Obras Públicas ha determinado que el peticionario está incapacitado permanentemente para conducir, habiéndosele cancelado la autorización por razones de tal incapacidad total.

Me temo que el Legislador no dispuso tal cosa porque ello hubiera destruido el fin mismo de la legislación. No debe perderse de vista la naturaleza de la misma. Se legisló creando un sistema social de protección en un plano en que se imponen obligaciones y se acumulan derechos a larga perspectiva, no fue una legislación para un determinado día,

momento o situación. No pudo contemplarse, por ejemplo, que ante las peripecias del trabajo del chófer que conduce como su principal ocupación y que lo exponen a incurrir en violaciones de la ley de tránsito, un miembro del sistema pierda sus beneficios porque en un determinado momento en que surja la necesidad de reclamarlos tuviere suspendida su licencia o hubiere conducido sin estar autorizado, como sucedería en el caso leve del chófer a quien habiéndosele dado una denuncia-citación (ticket) condujera después del día señalado para comparecer, sin haber gestionado la devolución de la licencia retenida. No hay duda que se habría cometido una infracción de la reglamentación del tránsito, pero no sería de la facultad del Secretario del Trabajo, dentro de la Ley 428, perseguirlo ni castigarlo negándole beneficios. Hacer castigar a este peticionario era responsabilidad de la policía, y en otro aspecto de su caso, la responsabilidad pudo ser también de su patrono, el Gobierno de la Capital, y del propio Administrador del seguro al no proveer a estos trabajadores de poca instrucción y conocimientos la información adecuada en un asunto tan relacionado con el medio de ellos ganarse su sustento diario. Este peticionario sufrió un castigo por la violación de la ley de tránsito inconmensurablemente mayor que el que hubiera sufrido bajo las disposiciones de la propia ley de automóviles.

La tercera premisa al efecto de que el pago de las cuotas por este obrero no tenía consecuencias jurídicas y así, cotizando, no quedaba dentro del marco del sistema, es para mí una *"finesse"* que no encuentra sitio dentro del espíritu en que estas agencias administrativas deben interpretar y aplicar los estatutos de fines reparadores y de propósitos humanitarios, debiendo ser el objetivo que se cumplan dichos propósitos, no que se derroten. Irónicamente, esas cotizaciones tuvieron consecuencias jurídicas a los fines de retenerlas el Fondo como legítimamente ingresadas, y no devolverlas al negar los beneficios.

*Por todas las consideraciones antes expuestas no puedo sancionar las actuaciones administrativas en este caso y dispondría que el fallo de la Comisión sea revocado y se conceda al obrero peticionario los beneficios a que tenía derecho bajo la Ley 428 de 1950.*