Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dr. Felipe Piovanetti García<br>H/N/C F.P. Morgan & Company<br><br>    Recurrido<br><br><br>               v.<br><br>Nicolás Touma y Carmen Taveras,<br>Y la Sociedad de Gananciales que tienen<br>Constituida entre sí, y Roberto Tirado<br>y Aurea Rodríguez Tirado<br>y la Sociedad de Gananciales que tienen<br>constituida entre sí<br><br>    Peticionarios | Certiorari<br><br>2010 TSPR 61<br><br>178 DPR \_\_\_\_ |

Número del Caso: CC-2009-138
                     CC-2009-229

Fecha: 22 de abril de 2010

Tribunal de Apelaciones:

      Región Judicial de San Juan, Panel Especial

Juez Ponente:
               Hon. José L. Miranda de Hostos, J.

Abogado de la Parte Peticionaria:

               Lcdo. Rafael Baella-Silva
               Lcdo. Juan C. Cuesta Guevara

Abogado de la Parte Recurrida:

               Lcdo. Osvaldo Pérez Marrero

Materia: Sentencia Declaratorio, Etc.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Dr. Felipe Piovanetti García H/N/C F.P. Morgan & Company<br><br>Recurrido<br><br>v.<br><br>Nicolás Touma y Carmen Taveras, y la Sociedad de Gananciales que tienen constituida entre sí, y Roberto Tirado y Aurea Rodríguez de Tirado, y la Sociedad de Gananciales que tienen constituida entre sí<br><br>Peticionarios | CC-2009-138<br>CC-2009-229 | |

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico, a 22 de abril de 2010.

En esta ocasión nos corresponde interpretar por primera vez la Ley Núm. 214 de 14 de octubre de 1995, "Ley para Reglamentar el Negocio de Intermediación Financiera",[1] y determinar si ésta aplica a un corredor de valores que sin poseer una licencia válida requerida por la referida Ley, gestiona, a cambio de una comisión, un financiamiento. Asimismo, conforme a esas circunstancias debemos determinar la validez y exigibilidad del contrato otorgado.

---

[1] 7 L.P.R.A. sec. 1071 *et seq.*

I.

El matrimonio compuesto por el Sr. Nicolás Touma y la Sra. Carmen Taveras (matrimonio Touma-Taveras), así como el matrimonio compuesto por el Sr. Roberto Tirado y la Sra. Áurea Rodríguez (matrimonio Tirado-Rodríguez), eran dueños de dos tercios de las acciones de la corporación Victory Insurance Corporation. Cada matrimonio era dueño de un tercio. El tercio restante era propiedad del matrimonio compuesto por el Sr. Rafael Claudio y la Sra. Norma Figueroa (matrimonio Claudio-Figueroa).

Los matrimonios Touma-Taveras y Tirado-Rodríguez (recurrentes) deseaban comprar las acciones del matrimonio Claudio-Figueroa mediante lo que se conoce como un "buy out". Así pues, ambos matrimonios contrataron al Dr. Felipe N. Piovanetti García (recurrido) para que gestionara, a través de instituciones financieras, la obtención de un préstamo para poder adquirir las acciones del matrimonio Claudio-Figueroa. El señor Piovanetti García H/N/C F.P. Morgan & Company se desempeñaba como corredor de valores especializado en gestionar financiamientos corporativos a través de instituciones financieras.

El acuerdo final entre el recurrido y los recurrentes se perfeccionó el 22 de enero de 1998 mediante un contrato de servicios "Contract Fee Agreement". En dicho acuerdo se estableció que el señor

Piovanetti García sería el responsable de gestionar reuniones entre las instituciones financieras y ambos matrimonios, así como a estar presente en éstas con el fin de lograr la concesión del financiamiento deseado. A su vez, éste obtendría una comisión por el corretaje del préstamo de un 3% de la suma financiada.

El recurrido realizó las gestiones encomendadas y logró que el Banco Scotiabank de Puerto Rico (Banco) le hiciera una oferta de préstamo a ambos matrimonios por la cantidad de $4,300,000.00. El 11 de marzo de 1998 el Banco emitió los documentos en los cuales expuso los términos y condiciones del financiamiento ("Term Sheets") para la evaluación y posterior tramitación del préstamo. Dicho documento exigía el pago de $70,000.00 a ser pagados en un 50% al momento de la firma del "Term Sheet", y el restante 50% al momento del cierre o firma del contrato de financiamiento. El 13 de marzo de 1998, ambos matrimonios suscribieron los referidos "Term Sheets" y realizaron el primer pago de $35,000.00.

Sin embargo, posteriormente ambos matrimonios –Touma-Taveras y Tirado-Rodríguez– rechazaron la oferta del Banco y no acudieron al cierre del financiamiento, por lo que nunca realizan el segundo pago de $35,000.00.[2]

Así las cosas, el 31 de diciembre de 1998 el señor Piovanetti García presentó una demanda sobre sentencia

---

[2] Ambos matrimonios obtuvieron el financiamiento deseado a través del Banco Bilbao Vizcaya Argentaria (BBVA), esta vez sin la intermediación del señor Piovanetti García.

declaratoria, incumplimiento de contrato y daños y perjuicios ante el Tribunal de Primera Instancia. En su causa de acción éste alegó que había cumplido con todas su obligaciones conforme a lo pactado en el contrato. Además, expuso que los recurrentes se habían obligado a aceptar todos los términos y condiciones del financiamiento, al suscribir los "Term Sheets" del Banco y al pagar la suma de $35,000.00 como pago inicial de la obligación convenida. Por consiguiente, alegó una deuda por concepto de honorarios ascendente a $129,000.00, equivalente al 3% pactado en el contrato, y reclamó una suma adicional, no menor de $100,000.00, por concepto de daños.

Por su parte, desde los inicios del pleito ambos matrimonios demandados solicitaron la desestimación de la demanda al amparo de la Regla 36.2 de Procedimiento Civil,[3] porque, entre otras cosas, el señor Piovanetti García no tenía licencia para realizar los servicios de intermediación financiera conforme lo establece la "Ley para Reglamentar el Negocio de Intermediación Financiera", *supra*.

Tras varios procedimientos, el 7 de octubre de 2008 el Tribunal de Primera Instancia (T.P.I.) emitió sentencia sumaria y desestimó la demanda del señor Piovanetti García. Concluyó el T.P.I. que el contrato

---

[3] 32 L.P.R.A. Ap. III R.36

suscrito entre las partes tenía causa ilícita porque el señor Piovanetti García no estaba facultado en ley para dedicarse al negocio de intermediación financiera. Además, y por otro lado, el T.P.I. señaló que ambos matrimonios demandados debieron haber conocido que el demandante no tenía licencia para fungir como intermediario por lo que no les asistía el derecho a repetir los $35,000.00 adelantados.[4]

Inconforme, el recurrido presentó un recurso de apelación ante el Tribunal de Apelaciones, alegando que el T.P.I. había cometido ocho (8) errores, los cuales principalmente se fundamentaron en la alegación de que se había interpretado erróneamente el contrato. Además, arguyó que el foro primario ignoró que las personas inscritas en los mercados de valores "New York Stock Exchange" (NYSE) y "National Association of Securities Dealers Automated Quotation"(NASDAQ) están exentas de los requisitos de obtener licencias de valores y para el negocio de intermediación financiera en Puerto Rico. Además, el señor Piovanetti García sostuvo que la definición que hace la ley que reglamenta la intermediación financiera en Puerto Rico excluye los asesores de inversiones y corredores-traficantes de valores.

---

[4] Es preciso aclarar que, contrario a lo resuelto por el T.P.I., ambos matrimonios realizaron el pago de $35,000.00 al Banco y no como un adelanto de la comisión del señor Piovanetti García.

El 15 de diciembre de 2008, el Tribunal de Apelaciones revocó el dictamen del Tribunal de Primera Instancia por entender que ante la existencia de varios hechos materiales en controversia no procedía el dictamen de sentencia sumaria. Según explicó, los hechos controvertidos eran los siguientes: determinar si hubo aceptación de los términos del financiamiento; si los recurrentes no comparecieron al cierre del contrato de manera unilateral y buscaron evadir el pago de la comisión pactada; si los recurrentes utilizaron la información y negociación obtenida por el señor Piovanetti García para obtener una oferta similar o idéntica con otra institución; y por último, si al momento de los hechos el demandante estaba exento de los requisitos de la ley local para obtener licencia de intermediación financiera, por razón de estar inscrito en el NYSE y NASDAQ.

Inconformes, los matrimonios Touma-Taveras y Tirado-Rodríguez presentaron oportunamente sus respectivas mociones de reconsideración. Sin embargo, el Tribunal de Apelaciones denegó ambas mociones. Así pues, los matrimonios Touma-Taveras y Tirado-Rodríguez presentaron oportunamente sus respectivos recursos de *certiorari* ante este Tribunal y plantearon la comisión de errores similares. El matrimonio Touma-Taveras expresó que:

1. Erró el Tribunal de Apelaciones al interpretar que unas inscripciones en NYSE y NASDAQ que supuestamente tiene el recurrido podrían eximirlo de cumplir con el requisito sine qua non de poseer una licencia expedida por OCIF que dispone la Ley para reglamentar el negocio de intermediación financiera.

2. Erró el Tribunal de Apelaciones al devolver el caso a instancia para que determinara en sus méritos un asunto sobre el cual no existe controversia real sustancial, a saber: el recurrido no tiene licencia para fungir como intermediador financiero en PR, y, consecuentemente, el contrato otorgado entre las partes tiene causa ilícita.

Del mismo modo, el matrimonio Tirado-Rodríguez planteó en su recurso que:

1. Erró el TA al concluir que el recurrido se encontraba eximido de cumplir con la autorización de OCIF para ejercer como corredor de préstamos al momento de perfeccionamiento del Contrato con los recurrentes.

2. Erró el TA al concluir que no procedía resolverse sumariamente el caso sin celebrase una vista en los méritos.

El 28 de agosto de 2009 ordenamos la consolidación de ambos recursos y le concedimos a la parte recurrida el término de 20 días para que compareciera y mostrara causa por la cual no debíamos modificar la sentencia dictada por el Tribunal de Apelaciones. En cumplimiento de nuestra orden el Dr. Felipe N. Piovanetti García compareció por escrito. Así pues, con ambos casos debidamente consolidados y con el beneficio de las

comparecencias de las partes, expedimos el recurso y procedemos a resolver.

II.

En varias ocasiones este Tribunal ha atendido controversias relativas al contrato de corretaje, el cual hemos definido como aquel "por el cual uno se obliga a pagar a otro (el corredor) una remuneración (la comisión) por la información de la ocasión para concluir un contrato o por la mediación en un contrato."[5] Es decir, a través de esta figura contractual una persona (el comitente) promete a otra (el corredor) una retribución o comisión por indicar la ocasión para celebrar un contrato o simplemente por mediar en el mismo, cualquiera que éste sea (compraventa, transporte, préstamo, seguro, etc.).[6]

El contrato de corretaje ha sido descrito como uno atípico, innominado, principal, consensual y puede ser bilateral o unilateral, según resulten obligadas cada una de las partes.[7] Sobre ello hemos resuelto que este

---

[5] Col. Int'L Sek P.R. Inc. v. Escribá, 135 D.P.R. 647, 655 (1994); J. Puig Brutau, Fundamentos de Derecho Civil, 3era ed., Barcelona, Ed. Bosch, 1982, T. II, Vol. II, pág. 480.

[6] Véase, J. Santos Briz y otros, Tratado de Derecho Civil: Teoría y Práctica, Barcelona, Ed. Bosch, 2003, T. IV, pág. 461; R. Uría, Derecho Mercantil, 25ta edición, Madrid, Ed. Marcial Pons, 1998, pág. 751.

[7] Meléndez Guzmán v. Berríos López, res. el 16 de enero de 2008, 2008 T.S.P.R. 3, 172 D.P.R. __ (2008). Es preciso señalar que aunque en el referido caso describimos dicho contrato como uno bilateral, la doctrina civilista está bastante dividida al respecto. Además, no obstante lo anterior, este Tribunal en Col. Int'L Sek P.R. Inc. v. Escribá, supra, escolio 12 (1994), reconoció los supuestos de unilateralidad y bilateralidad del contrato de corretaje al citar

tipo de contrato, por no estar regulado expresamente en

nuestro Código Civil, se regula en primer lugar por lo

acordado entre las partes y, en su defecto, se rige por

las disposiciones generales relativas a los contratos y

aquellas reglas aplicables a los contratos afines, en

particular el mandato.[8] Por consiguiente, en ausencia de

disposiciones expresas que regulen el contrato de

---

con aprobación la posición del tratadista alemán Enneccerus, el cual distingue tres tipos de contrato de corretaje, a saber:

> "a)    El contrato *unilateral* de corretaje o puro. El corredor *no se obliga a la actividad*, y su prestación es únicamente una *condición* de su derecho a recibir la comisión. Pero esto no excluye que haya de ajustarse a las exigencias de la *fidelidad contractual* (Sec. 242), o sea, no le es lícito obrar en contra de los intereses del mandante, tiene que obrar discretamente y no le es lícito abandonar caprichosamente y en daño del mandante la actividad voluntariamente comenzada, etc.
>
> b)    El contrato *bilateral* de corretaje, en el cual también el corredor asume una *obligación dirigida a indicar la ocasión para concluir un contrato o a mediar en un contrato*. Semejante contrato cae ciertamente dentro del concepto del contrato de corretaje, pero es a la vez un contrato de servicios, ya que se promete a título oneroso una actividad (no el resultado), constituyendo, por tanto, una clase especial del contrato de servicios (contrato de servicios de corredor) al que se aplican, en primer lugar, las disposiciones sobre el contrato de corretaje, pero además, en tanto que de estas y de la esencia del contrato de corretaje no resulte una especialidad, las disposiciones sobre el contrato de servicios.
>
> c)    El contrato *bilateral* de corretaje (por cierto poco frecuente) por el cual el corredor *promete el resultado mismo*, por ejemplo, obligándose a proporcionar una hipoteca de una determinada cuantía y bajo determinadas condiciones (intereses, etc.). A este contrato (contrato de obra de corredor) se aplican las disposiciones sobre el contrato de corretaje y, subsidiariamente, las relativas al contrato de obra." Véase, L. Enneccerus, Tratado de Derecho Civil, (B. Pérez González y J. Alguer), Barcelona, Ed. Bosch, 1966, Tomo II, Vol. 1, pág. 561.

[8] Meléndez Guzmán v. Berríos López, *supra*; Col. Int'L Sek P.R. Inc. v. Escribá, *supra*, pág. 654-655 (1994); Dumont v. Inmobiliaria Estado, Inc., 113 D.P.R. 406 (1982); Torres v. Arbona, Jr., 72 D.P.R. 769 (1951). Véase, J. Castán Tobeñas, Derecho Civil español, común y foral, 15ta ed., Madrid, Ed. Reus, 1993, T. IV, pág. 571.

corretaje, nuestra jurisprudencia ha ido delimitando las consecuencias y características de dicho contrato.

En torno a las principales consecuencias que derivan del contrato de corretaje, en <u>Col. Int'L Sek P.R. Inc.</u> v. <u>Escribá</u>, 135 D.P.R. 647, 656 (1994), acogimos los pensamientos del tratadista Puig Peña, a saber:

> a) Que lo característico de la actuación del mediador consiste en que se limita a poner en relación directa o indirecta a los futuros contratantes, *sin participar él personalmente en el contrato* ni como representante de una de las partes ni como simple mandatario o comisionista suyo; es decir, queda siempre fuera del contrato resultante de su actividad.
>
> b) Que es de esencia al contrato de corretaje la existencia de un *premio o retribución*.[9]

Así pues, los elementos reales de este tipo de contrato son el servicio de mediación, el cual ha de ser determinado y lícito, y la comisión.[10] La cuantía de esta última dependerá de lo pactado entre las partes, salvo que esté sometida a regulación del Estado.[11]

Ahora bien, como norma general el corredor no tiene derecho a la comisión si no se celebra o perfecciona el contrato encargado.[12] Por lo tanto, el derecho del

---

[9] F. Puig Peña, <u>Tratado de Derecho Civil Español</u>, 2da ed. Rev., Madrid, Ed. Revista de Derecho Privado, 1973, T. IV, Vol. II, pág. 413.

[10] Castán Tobeñas, <u>op. cit.</u>, pág. 573.

[11] Véanse, Íd.; Santos Briz, <u>op. cit.</u>, pág. 463;

[12] <u>Meléndez Guzmán</u> v. <u>Berríos López</u>, *supra*; Santos Briz, <u>op. cit.</u>, pág. 462.

corredor a recibir la comisión pactada surge una vez el contrato ha sido perfeccionado, salvo pacto en contrario que requiera la consumación.[13] No obstante, en Col. Int'L Sek P.R. Inc. v. Escribá, *supra*, págs. 656-657, citando el caso Torres v. Arbona, Jr., 72 D.P.R. 769, 778 (1951), aclaramos con relación al derecho que tiene el corredor a cobrar la comisión que:

> La jurisprudencia americana se pronuncia casi unánimemente en el sentido de que en casos de esta índole basta que el corredor a quien se ha encomendado la venta de determinada propiedad encuentre un comprador dispuesto, deseoso y en condiciones económicas de comprar (*ready, willing and able*) para que el corredor tenga derecho a la comisión, así como en el sentido de que cuando existiere el pacto de que el corredor tendrá derecho a su comisión cuando quede consumado el contrato, el derecho a la comisión subsiste en aquellos casos en que la no consumación sea debido al fraude, culpa o mala fe del vendedor. Desde luego, si el corredor o presunto comprador tenían conocimiento de los defectos o vicios de que adolecía la cosa el vendedor no es responsable, puesto que entonces no puede imputársele mala fe, culpa o negligencia. (Citas, énfasis y escolios omitidos.)

De hecho, tanto la jurisprudencia federal así como la tradición civilista han reconocido que el derecho del corredor a cobrar la comisión pudiera subsistir en situaciones en las cuales no ocurra el perfeccionamiento o consumación del contrato. Ello es así, en instancias en las cuales dicha actuación haya sido ocasionada por el vendedor o comitente y sin mediar razones

---

[13] Véase, Lamboy v. Irizarry, 73 D.P.R. 331, 333-334 (1952).

justificadas. Por ejemplo, el Tribunal Supremo de los Estados Unidos, citando el artículo 2040 del Código Civil de Luisiana —análogo al artículo 1072 de nuestro Código Civil— expresó que el derecho a la comisión subsiste aun cuando el vendedor se niega a cumplir con el acuerdo sin razones justificadas.[14]

Asimismo, la doctrina civilista española ha reconocido algunas instancias en las cuales el derecho a la remuneración subsiste aunque el contrato celebrado por la mediación del corredor no llegue a consumarse. Conforme a ello, se ha entendido que el derecho a la remuneración "no puede enervarse por el desistimiento unilateral del vendedor".[15]

A pesar de lo antes expuesto, los hechos particulares del caso de autos requieren que inicialmente determinemos si al Dr. Felipe N. Piovanetti García le son aplicables las disposiciones de la Ley Núm. 214 del 14 de octubre de 1995, la cual reglamenta el negocio de intermediación financiera. En consecuencia, debemos determinar si el contrato por él otorgado es uno válido y, por ende, si él tiene derecho

---

[14] Kock v. Emmerling, 63 U.S. 69 (1860). Véase además, Crowe v. Trickey, 204 U.S. 228 (1907).

[15] Uría, op. cit., pág. 752. Además, se ha entendido que la remuneración podría devengarse: "siempre que de las gestiones del mediador se haya aprovechado quien concluya el contrato". Íd.; Santos Briz, op. cit. De igual forma, el corredor tendría derecho a la remuneración "si ha habido un principio de ejecución del negocio mediado y luego se interrumpe por el oferente" y "si la conclusión del negocio mediado ha sido impedido por el oferente". J.M. Martínez Val, Derecho Mercantil, Barcelona, Ed. Bosch, 1979, pág. 490.

a cobrar la comisión pactada, aun cuando no se haya perfeccionado el contrato encargado.

### III.

### A.

Es altamente conocido que el Estado, como parte de su poder de razón de estado, tiene la facultad para reglamentar las profesiones, fundamentado en razones de alto interés público como la salud, la seguridad y el bienestar general.[16] Por tal razón, a través de los años se ha reglamentado la industria financiera por ésta estar revestida de un alto interés público, económico y social. Así, como parte de los estatutos que regulan dicha industria, se crea la Ley Núm. 214 de 14 de octubre de 1995, conocida como la "Ley para Reglamentar el Negocio de Intermediación Financiera", según enmendada.[17] Esta Ley tiene como propósito el reglamentar, supervisar y fiscalizar las instituciones y personas que, abierta o solapadamente, realizan negocios de intermediación financiera —como prestamistas, agentes, planificadores, consultores o asesores financieros, corredores o intermediarios de otros tipos de préstamos y financiamientos— sin estar debidamente autorizados a tales fines por ley o reglamento.[18]

---

[16] Román v. Trib. Exam. De Médicos, 116 D.P.R. 71, 77 (1985); Marcano v. Departamento Estado, 163 D.P.R. 778, 786 (2005).

[17] 7 L.P.R.A. sec. 1071 et seq.

[18] Véase, Exposición de Motivos, Ley Núm. 214 de 14 de octubre de 1995.

Con la aprobación de la referida Ley Núm. 214, *supra*, la Asamblea Legislativa extendió la jurisdicción de la Oficina del Comisionado de Instituciones Financieras (O.C.I.F.) para reglamentar, supervisar y fiscalizar a las instituciones, entidades y personas que realizan negocios de intermediación financiera. Ello, con el propósito de evitar que ante el auge de este tipo de negocio en Puerto Rico la ciudadanía sufriera los efectos del engaño y el fraude por parte de aquellos que ofrecen este tipo de servicios.[19] El legislador expresó específicamente que, "[c]omo resultado de estos ofrecimientos y debido a las necesidades y, en muchos casos, a la desesperación de algunas personas, éstas se han convertido en víctimas inocentes de personas inescrupulosas que con el pretexto de brindarle una solución a sus problemas económicos, las han hecho presas del engaño y el fraude".[20] Por tal razón, el poder legislativo entendió necesario y conveniente obligar a toda entidad o persona que pretenda realizar negocios de intermediación financiera estar debidamente autorizado para ello.[21] Así pues, es evidente que el propósito primordial de la Ley es la protección del consumidor.

La Ley Núm. 214, *supra*, requiere que **toda persona –salvo aquellas expresamente exentas de su cumplimiento–**

---

[19] Íd.

[20] Íd.

[21] Íd.

**obtenga una licencia, a ser expedida por la O.C.I.F., previo a ofrecer servicios de intermediación financiera.**[22] La obtención de dicha licencia conlleva el pago de derechos y cuotas anuales que varían según el volumen de negocios y el número de oficinas que tenga el concesionario.[23] Además, entre otras cosas, la Ley exige la prestación de una fianza y mantener cierto capital líquido para responder por el fiel cumplimiento de las obligaciones del negocio.[24] Cabe señalar que la Ley establece que violar sus disposiciones o los reglamentos promulgados en virtud de la misma podría constituir un delito menos grave o grave. Entre las posibles violaciones se encuentra fungir como intermediario financiero, sin tener licencia para ello y, solicitar,

---

[22] La obligación antecedida surge del Artículo 4 de la Ley Núm. 214, *supra*, 7 L.P.R.A. sec. 1073, el cual dispone:

Ninguna persona, excepto las excluidas de la aplicabilidad de este capítulo, los bancos autorizados a operar en Puerto Rico, compañías de fideicomisos, agencias federales o dependencias del Estado Libre Asociado de Puerto Rico, cooperativas de ahorro y crédito, sistemas de retiro gubernamentales, asociaciones de ahorros y préstamos federales, compañías de seguros autorizadas por el Secretario de Hacienda a hacer negocios en Puerto Rico y personas naturales que concedan préstamos o financiamientos con un volumen combinado de negocios anual que no exceda de diez mil (10,000) dólares, podrá dedicarse al "Negocio de Intermediación Financiera" sin antes obtener una licencia expedida por el Comisionado, conforme a lo dispuesto en este capítulo.

[23] Arts. 5 y 7 de la Ley Núm. 214, *supra*, 7 L.P.R.A. secs. 1074 y 1076.

[24] Art. 8 de la Ley Núm. 214, *supra*, 7 L.P.R.A. sec. 1077. "La obligación de prestar fianza provee una salvaguarda para proteger los derechos de los consumidores, en caso de que el concesionario faltare en el cumplimiento de sus obligaciones para con el cliente." Informe de la Comisión de Asuntos del Consumidor de la Cámara de Representantes sobre el P. de la C. 2091 de 30 de agosto de 1995, 8va Sesión Extraordinaria, 12ma Asamblea Legislativa, pág. 2.

recibir o cobrar por adelantado el pago total o parcial de cualquier comisión o cargo por los servicios a ser prestados, aún con licencia de intermediario.[25]

Ahora bien, el Artículo 3 de la Ley Núm. 214, *supra*, dispone que ésta "aplicará a toda persona que ofrezca o preste servicios como corredor de préstamos y financiamientos y a todo prestamista, agente planificador financiero, consultor o asesor financiero", según estos términos son definidos en la Ley. Por ende, para comprender la aplicabilidad y extensión de la Ley debemos analizar las definiciones pertinentes al caso de autos.

El término *negocio de intermediación financiera* se define específicamente en el inciso (a) del Artículo 2, el cual dispone:

> Negocio de intermediación financiera – **Significa e incluye ofrecer servicios o dedicarse a actividades de planificación, consultoría o asesoramiento financiero, concesión de préstamos, corredor de préstamos hipotecarios sobre bienes inmuebles o corredor de otros tipos de préstamos y financiamientos,** mediante contacto personal, telefónico o escrito, o mediante anuncios en periódicos, publicaciones, hojas sueltas, rótulos, cruzacalles, guía telefónica, radio, televisión o a través de cualquier otro medio similar, **a prestar dichos servicios a una persona que no sea su pariente dentro del cuarto grado de consanguinidad o segundo grado de afinidad, y que la prestación de dichos servicios requiera el pago de un cargo por servicio o comisión por parte de la persona para quien se gestiona, tramita, planifica, concede u obtiene el préstamo o financiamiento.**

---

[25] Arts. 11 y 18 de la Ley Núm. 214, *supra*, 7 L.P.R.A. secs. 1080 y 1087.

Incluye, además, ofrecer planes o servicios para reducir el pago de intereses o el término de préstamos hipotecarios sobre bienes inmuebles *mortgage reduction plans*. **Este término no incluye a los agentes, corredores traficantes, consultores o asesores de inversiones y valores cubiertos** por la Ley Núm. 60 de 18 de junio de 1963, según enmendada, y la Ley Núm. 6 de 19 de octubre de 1954, según enmendada, conocidas respectivamente como **"Ley Uniforme de Valores de Puerto Rico" y "Ley de Compañías de Inversiones de Puerto Rico", ni a un abogado, contable, economista, ingeniero o maestro cuya prestación de estos servicios sea meramente incidental al ejercicio de su profesión.**[26] (Énfasis suplido.)

De la definición anterior se desprende que el término incluye a toda persona dedicada a actividades de planificación, consultoría, asesoramiento financiero, concesión y corretaje de préstamos, que presten sus servicios a personas fuera de su cuarto grado de consanguinidad y segundo grado de afinidad; y que a su vez, cobren cargos o comisiones por la prestación de dichos servicios. Sin embargo, los agentes, corredores traficantes, consultores o asesores de inversiones y valores, **cubiertos por la Ley Uniforme de Valores**, *supra*, **o la Ley de Compañías Financieras**, *supra*, así como los abogados, contables, economistas, ingenieros y maestros, cuya prestación de los servicios antecedidos sea meramente incidental al ejercicio de su profesión, están exentos de esta definición.

Por otro lado, el Artículo 3 de dicha Ley dispone ciertas exclusiones adicionales, las cuales están

---

[26] 7 L.P.R.A. sec. 1071(a).

sujetas a la prohibición de cobrar por los servicios de intermediación financiera. Dicho artículo dispone lo siguiente:

(b) *Exclusiones*. Esta Ley no aplicará a cualquier persona que actúe en su capacidad de dueño, socio, director, oficial, agente o empleado de cualquier negocio autorizado por ley tales como: bancos, asociaciones y bancos de ahorro y préstamos, compañías de financiamiento, financieras, instituciones hipotecarias y otras similares cuya actividad principal sea el conceder préstamos o financiamientos, con licencia para ello.

Tampoco aplicará a aquella persona que como dueño, socio, director, oficial, agente o empleado se dedique a cualquier negocio en que la obtención de préstamos o financiamientos para los clientes de dicho negocio sea inherente, incidental o necesario al mismo, tales como los negocios de venta o arrendamiento de bienes y servicios.

El Fideicomiso de Vivienda y Desarrollo Humano de Puerto Rico, según el mismo ha sido creado y es operado bajo la Escritura Núm. 135 del 7 de mayo de 2004, otorgada ante el Notario Jose Orlando Mercado Gely, está exento de la aplicación de esta ley.

(c) *Prohibiciones*. Las personas excluidas de la aplicación de esta ley, descritas en el inciso anterior, **podrían dedicarse al negocio de intermediación financiera sin licencia para ello, exclusivamente para beneficio de su institución, pero al hacerlo no podrán cobrarle comisión o cargo alguno por dichos servicios en su carácter personal.**[27] (Énfasis suplido.)

De la disposición antecedida puede colegirse que las personas que se dediquen a cualquier negocio en que la obtención de préstamos o financiamientos para los clientes de dicho negocio sea inherente, incidental o

---

[27] 7 L.P.R.A. sec. 1072.

necesario al mismo, no les aplica el referido estatuto. Así como tampoco a aquellos que actúen en representación de entidades financieras cuyo propósito principal sea el conceder préstamos o financiamientos, con licencia para ello. Sin embargo, el inciso (c) señala claramente que las personas excluidas por el inciso (b) podrían realizar funciones de intermediación financiera con la condición de que sea para beneficio de la institución para la cual trabajan y no podrán cobrar cargo o comisión alguna para su persona por la prestación de dichos servicios.

En otras palabras, la Ley Núm. 214, *supra*, dispone dos tipos de exclusiones, la que surge del Artículo 2 y la que proviene del Artículo 3. En torno a la primera exclusión, la cual surge de la definición del término *negocio de intermediación financiera*, es claramente palpable que ella establece una lista taxativa de profesionales exentos. En cambio, la exclusión que proviene del Artículo 3 es más abarcadora al ser de aplicación a cualquier persona que cumpla con los requisitos allí dispuestos. Sin embargo, los efectos en ambas exclusiones son distintos.

La exclusión proveniente del Artículo 3 está sujeta a la limitación provista en el inciso (c) del propio artículo, el cual dispone que las personas excluidas en el inciso (b) pudieran dedicarse al negocio de intermediación financiera sin licencia para ello,

exclusivamente para beneficio de su institución y sin derecho a cobrar una comisión o cargo en su carácter personal.

Al contrario, los profesionales excluidos de la definición del Artículo 2 podrían brindar servicios de intermediación financiera y cobrar por ello. No obstante, somos de la opinión que la referida exclusión refleja distintas derivaciones, es decir, la exclusión no opera de forma similar para los profesionales allí enunciados. Lo dispuesto en el Artículo 2 demuestra dos grupos de profesionales excluidos, los que están cubiertos por la Ley Uniforme de Valores, *supra*, y la Ley de Compañías Financieras, *supra*, y los demás.

Los profesionales que componen el primer grupo –los agentes, corredores traficantes, consultores o asesores de inversiones y valores, cubiertos por las leyes antecedidas– están exentos de cumplir con las disposiciones de la Ley Núm. 214, *supra*. Lo anterior se sustenta en el hecho de que éstos profesionales realizan funciones análogas a las de intermediación financiera, además de estar sometidos a regulación estatal a través de las leyes de valores y compañías financieras.[28] Así pues, entendemos que la clara intención legislativa es

---

[28] Por ejemplo, los servicios de planificación financiera están incluidos tanto en la definición de *negocio de intermediación financiera* provista en la Ley Núm. 214, *supra*, como en la definición de *asesor de inversiones* del Artículo 401 inciso (f) la Ley Uniforme de Valores, *supra*, por ende los asesores financieros, entre otros, ya están regulados por la Ley Uniforme de Valores, *supra*. 10 L.P.R.A. sec. 881.

que los referidos profesionales -cubiertos por la Ley Uniforme de Valores y la Ley de Compañías Financieras- estén exentos totalmente de la aplicación de la Ley Núm. 214, *supra*.

En cambio, el legislador expresó que existen profesionales, que aunque ajenos a este tipo de negocio, podrían prestar estos servicios incidentalmente y cobrar por ello. Por tal razón, a los abogados, contables, economistas, ingenieros y maestros, el legislador les aplicó una exención más limitada por lo que éstos podrían practicar la intermediación financiera de forma incidental al ejercicio de su profesión.[29]

B.

Ahora bien, el legislador dejó claro que el propósito de la Ley Núm. 214, *supra*, no es regular y fiscalizar al profesional que se dedica a la consultoría y ofrecimiento de servicios de asesoramiento financiero pero que nunca sirve de intermediario para propósitos de préstamos.[30] Más bien, el fin primordial de dicho estatuto es regular el ejercicio de la intermediación de

---

[29] Cabe señalar que cuando se aprobó la Ley Núm. 214, *supra*, los economistas no estaban incluidos en la referida exclusión. Sin embargo, a través de la Ley Núm. 125 de 21 julio de 2000 se enmendó el inciso (a) del Artículo 2 de la Ley Núm. 214 para añadir a los economistas entre los profesionales exentos. El legislador entendió que los economistas prestan servicios de intermediación financiera de forma incidental al ejercicio de su profesión, por consiguiente en reconocimiento de la labor que éstos desempeñan en ciertas circunstancias se les incluyó junto a los profesionales cubiertos por la exclusión limitada. Véase, Exposición de Motivos de la Ley Núm. 125, *supra*.

[30] Informe de la Comisión de Asuntos del Consumidor de la Cámara sobre el P. de la C. 2091, *supra*, pág. 3.

préstamos y financiamientos en aras de proteger al consumidor. Conforme a ello, la Ley dispone que el término *negocio de intermediación financiera* incluye los servicios o actividades de planificación, consultoría o asesoramiento financiero, la concesión de préstamo y el corretaje de préstamos y financiamientos. El Artículo 2 define varios de estos servicios y funciones entre los cuales se encuentra el corredor de préstamos y financiamientos, término que se define en el inciso (d) de la siguiente forma:

> Significa cualquier individuo, corporación, sociedad, firma o entidad no incorporada, con o sin fines de lucro, que ofrece y contrata sus servicios para gestionar, tramitar u obtener préstamos hipotecarios sobre bienes inmuebles u otros tipos de préstamos y financiamientos para terceras personas a cambio de un cargo por servicio que puede ser directo, indirecto, ostensible, oculto o disfrazado.[31]

Asimismo, como complemento a la Ley, la O.C.I.F. promulgó el Reglamento Núm. 5721 en virtud de las disposiciones del Art. 16 de la Ley Núm. 214, *supra*.[32] Este Reglamento rige a toda persona o agente que actúe como corredor o intermediario en la tramitación de préstamos hipotecarios o personales, entre otros servicios, a cambio de una comisión, honorario o cargo.[33]

---

[31] 7 L.P.R.A. sec. 1071(d).

[32] Reglamento de intermediación financiera (Reglamento de O.C.I.F. Núm. 5721), 20 de noviembre de 1997. Dicho reglamento fue enmendado por el Reglamento Núm. 6535 de 21 de octubre de 2002, para disponer que su aplicación fuera permanente, pues el reglamento Núm. 5721 tenía vigencia de 5 años a partir de su aprobación.

[33] Íd., Art. 3 (1).

Conforme a lo anterior, evidentemente la Ley y el Reglamento hacen referencia a la tramitación de préstamos como una de las funciones principales del corredor de préstamos y que ciertamente la Ley pretende regular. Además, el Reglamento de O.C.I.F. Núm. 5721 brinda más claridad al respecto al definir el término *tramitación de préstamos* de la siguiente forma:

> Significa cualquier gestión en beneficio de o en representación de otros que lleve a cabo cualquier persona, incluyendo procesar toda la documentación necesaria para obtener un préstamo, a ser financiado por cualquier persona autorizada a conceder préstamos mediante el cobro de una comisión u honorario.[34]

Así pues, si una persona desea brindar servicios como corredor de préstamos y, por ende, tramitar préstamos, debe poseer la licencia establecida en la Ley salvo las excepciones que ya hemos discutido. No obstante, en el caso de los profesionales excluidos en el Artículo 2, los agentes, corredores traficantes, consultores o asesores de inversiones de valores cubiertos por la Ley de Uniforme de Valores, *supra*, o la Ley de Compañías Financieras, *supra*, podrían ejercer las funciones de corredor de préstamos, sin más, contrario a los abogados, contables, economistas, ingenieros y maestros quienes podrían ejercer dichas funciones sólo de forma incidental a su profesión principal.

---

[34] Íd., Art. 4 (5).

C.

Es principio reiterado que "cuando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu".[35] De esta forma, cuando el texto de la ley es claro e inequívoco esta es la expresión por excelencia de la intención legislativa.[36] Así, en instancias en las cuales la letra de la ley es clara no hay necesidad de indagar más allá de ella como pretexto para cumplir con su intención legislativa.[37]

Sin embargo, el Código Civil establece también la importancia de tomar en cuenta la voluntad del legislador al momento de interpretar las disposiciones de una ley. A esos efectos, el Artículo 19 del Código Civil[38] dispone que "el medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla". En ese sentido, hemos expresado que "al descargar nuestra función de interpretar una disposición particular en un estatuto, debemos siempre considerar cuáles fueron los principios perseguidos por la Asamblea Legislativa al aprobarla, de manera tal que su

---

[35] Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14.

[36] Romero Barceló v. E.L.A., 169 D.P.R. 460, 476-477 (2006).

[37] Íd.

[38] 31 L.P.R.A. sec. 19.

interpretación asegure el resultado que originalmente se quiso obtener".[39]

D.

Con ello en mente, al examinar la letra de la Ley Núm. 214, *supra*, su Exposición de Motivos, el historial legislativo y el Reglamento, resulta forzoso concluir que la Asamblea Legislativa excluyó de forma absoluta a los agentes, corredores traficantes, consultores o asesores de inversiones cubiertos por la Ley Uniforme de Valores, *supra*, y la Ley de Compañías Financieras, *supra*. Por lo tanto, éstos podrían practicar el negocio de intermediación financiera sin necesidad de obtener la licencia exigida por la Ley Núm. 214, *supra*.

IV.

En los casos de autos, el Dr. Felipe N. Piovanetti García y los matrimonios Tirado-Rodríguez y Touma-Taveras suscribieron un contrato, mediante el cual, el recurrido se obligó a tramitar un préstamo a favor de ambos matrimonios a cambio de una comisión del 3% de la cuantía financiada. En dicho contrato se estableció que los términos del financiamiento debían ser razonables y aceptados por los matrimonios, además la comisión iba a ser exigible una vez se produjera el cierre del préstamo. Por ende, es evidente que estamos ante un típico contrato de corretaje, por el cual el señor

---

[39] <u>Yiyi Motors, Inc.</u> v. <u>E.L.A.</u>, res. el 14 de octubre de 2009, 2009 T.S.P.R. 159, 177 D.P.R. ___ (2009).

Piovanetti García se obligó a gestionar préstamos con el fin de lograr un contrato entre los matrimonios y un banco o institución financiera que no es parte del contrato a cambio del pago de una comisión.

Ahora bien, claramente el contrato de corretaje de préstamos está regulado por la referida Ley de Intermediación Financiera. Ello, tiene la consecuencia de que para poder realizar este tipo de gestión se tiene que cumplir con los requisitos que impone la Ley. Así, para poder realizar gestiones como corredor de préstamos y cobrar por ello, es necesario tener una licencia por parte de la O.C.I.F. o estar claramente eximido por la Ley. Por lo tanto, nos corresponde determinar si la actuación del señor Piovanetti García estaría cubierta por algunas de las exenciones expuestas.

El Dr. Felipe N. Piovanetti García se desempeñaba como corredor de valores especializado en gestionar financiamientos corporativos a través de instituciones financieras. Realizaba funciones típicas del negocio de intermediación financiera. Sin embargo, al momento de la perfección del contrato de corretaje éste no contaba con licencia ni para actuar como corredor de valores ni para realizar negocios de intermediación financiera. Según surge del expediente, la O.C.I.F. certificó que para la fecha en se perfeccionó el contrato el recurrido no estaba registrado para llevar a cabo negocios como corredor bajo las disposiciones de la Ley Uniforme de

Valores, *supra*. En dicha certificación, del 21 de mayo de 2002, la Sra. Myrta Vélez, Supervisora de la División de Valores de la O.C.I.F., señaló que la inscripción del recurrido fue efectiva entre abril de 1981 y enero de 1997.

Por otro lado, la O.C.I.F. expide una segunda certificación el 15 de agosto del mismo año a través del subcomisionado, Sr. Antonio Salvá. En ella, se certificó que la inscripción del señor Piovanetti García, mencionada en la primera certificación, nunca había sido revocada, suspendida o cancelada por dicha Oficina. Es esta última certificación la que el recurrido utiliza para demostrar su inscripción y, no es menos cierto que parecería existir una contradicción entre ambas certificaciones. Sin embargo, el asunto fue debidamente aclarado por la señora Vélez mediante testimonio en deposición. Ella indicó que lo expresado en la segunda certificación se refería al término en el cual el recurrido estuvo inscrito.

En consecuencia, quedó evidenciado, tanto con las certificaciones como con el testimonio de la Sra. Myrta Vélez, que para la fecha en que el señor Piovanetti García realizó el contrato de corretaje no estaba inscrito en la O.C.I.F. como agente inversor conforme a lo dispuesto en la Ley Uniforme de Valores, *supra*. Su inscripción como corredor de valores había vencido en enero de 1997, por tal razón no estaba cubierto por la

referida Ley de Valores al momento de otorgar el contrato.

Además, de las propias alegaciones del señor Piovanetti García, así como del expediente surge que éste nunca había obtenido la licencia para actuar como intermediario financiero. El 22 de mayo de 2003 la O.C.I.F. certificó que hasta ese momento el recurrido no poseía licencia para operar bajo las disposiciones de la Ley Núm. 214, *supra*, ni durante el periodo comprendido entre el 7 de enero de 1998 y el 28 de febrero de 1999.

Por otro lado, el señor Piovanetti García también alegó que por ser corredor de valores inscrito en los mercados NYSE y NASDAQ, la ley local le exime de cumplir con los requisitos para obtener la licencia de valores y en específico, para el negocio de intermediación financiera. No le asiste la razón.

En primer lugar, del expediente no surgen las referidas inscripciones que éste alega tener. Al mismo tiempo, aun si tomáramos como cierta su inscripción en NYSE y NASDAQ, ese hecho por sí solo no le exime de cumplir con la Ley. Para sustentar su alegación, el recurrido utiliza como fundamento el artículo 2 de la Ley Núm. 214, supra, y la segunda certificación de la O.C.I.F. Sin embargo, ninguna de las dos fuentes utilizadas sostiene su alegación. En la certificación de la O.C.I.F., a la que el recurrido hace referencia, sólo se expresa que su inscripción como agente de inversiones

nunca fue revocada, suspendida o cancelada. Sin embargo, como ya hemos señalado dicha certificación se refería al término en que éste estuvo inscrito, es decir, desde abril de 1981 hasta enero de 1997. Por consiguiente, la referida certificación nada expone que justifique la alegación del señor Piovanetti García.

Asimismo, el Artículo 2 de la Ley Núm. 214 tampoco sostiene la alegación del recurrido. Como también hemos indicado, el referido artículo exime del cumplimiento de la Ley sólo a los corredores y asesores de valores que estén cubiertos por la Ley Uniforme de Valores, *supra*, y la Ley de Compañías de Inversiones, *supra*. Además, la Ley Núm. 214, *supra*, nada dispone sobre alguna exención que establezca que las personas inscritas en los mercados de valores NYSE y NASDAQ no necesitan la autorización de la O.C.I.F. para ejercer el negocio de intermediación financiera en Puerto Rico.

Ahora bien, es principio axiomático que una licencia suspendida o vencida carece de validez.[40] Ello implica que el poseer una licencia vencida equivale a no tener licencia. En el caso de autos, de la prueba surge que el recurrido tenía su licencia de agente de inversiones vencida. Por lo tanto, como el señor Piovanetti García no tenía la licencia requerida por la Ley Uniforme de Valores, *supra*, para ejercer como agente

---

[40] Véase, Rosario Mercado v. Comisión Industrial, 85 D.P.R. 336, 342 (1962).

de inversiones, claramente no le es aplicable la exención de la Ley Núm. 214, *supra*.

La política pública que fundamenta la Ley Núm. 214, *supra*, radica en el interés del Estado de proteger a la ciudadanía y garantizar a los consumidores que las personas que posean una licencia para ejercer como intermediarios financieros tengan la capacidad y la solvencia moral para realizar dichas funciones.[41] Así, como los profesionales cubiertos bajo la Ley Uniforme de Valores, *supra*, y la Ley de Compañías Financieras, *supra*, -excluidos de la Ley Núm. 214, *supra*- están regulados estatalmente por las referidas leyes, el consumidor no queda desprovisto de protección. Además, sería un contrasentido que una persona sin licencia de corredor o agente de inversiones válida utilice simplemente el nombre de su profesión para obtener la exención. Ello tendría el efecto de soslayar el cumplimiento de ambas legislaciones y el fin público perseguido.

El señor Piovanetti García ha sostenido desde el inicio del pleito que no fue contratado como corredor de valores, agente y/o asesor de inversiones.[42] Es más, alegó que sus gestiones no tenían nada que ver con

---

[41] Véase, Informe de la Comisión de Asuntos del Consumidor de la Cámara sobre el P. de la C. 2091, *supra*, pág. 2.

[42] Véase, escolio 1 del escrito de Oposición a la Sentencia Sumaria; escolio 5 del escrito de Apelación al Tribunal de Apelaciones y; el escolio 5 del escrito de Oposición al *Certiorari* presentado ante este Tribunal.

compraventas de valores o inversiones, más bien su única función era gestionar el financiamiento requerido.[43]

Así pues, a todas luces el único propósito del contrato suscrito por el recurrido fue el de gestionar un financiamiento. Su labor fue única y exclusivamente dirigida a gestionar un préstamo por el cual cobraría una comisión. Por consiguiente, utilizó su título profesional como subterfugio para realizar funciones de intermediación financiera sin tener licencia para ello y sin estar expresamente exento.

V.

Interpretando una situación similar a la que nos ocupa, en el caso <u>Col. Int'L Sek P.R. Inc.</u> v. <u>Escribá</u>, *supra*, tuvimos la oportunidad de expresarnos en torno a la validez de un contrato de corretaje de bienes raíces cuando el corredor no tenía licencia para ejercer la profesión. En el referido caso se había pactado el pago de una comisión a un corredor a cambio de que éste realizara unas gestiones que lograran la venta de unos terrenos. Una vez realizada la compraventa entre los dueños originales y los compradores, producto de la mediación del corredor, los dueños originales se negaron a pagarle la comisión.

En aquella ocasión al aplicar la Ley Núm. 10 del 26 de abril de 1994, conocida como la "Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor,

---

[43] Íd.

Vendedor o Empresa de Bienes Raíces en Puerto Rico",
determinamos que por el corredor no contar con la
licencia que dicho estatuto requería, éste no tenía
derecho al cobro de la comisión. Ello, porque al no
tener licencia de corredor de bienes raíces y fungir
como tal, violó la ley y, en consecuencia, el contrato
adolecía de causa ilícita. En otras palabras, el
contrato era nulo.

Es principio reiterado que los elementos
constitutivos de un contrato son el consentimiento, el
objeto y la causa.[44] La causa, en los contratos onerosos,
se ha entendido como la prestación o promesa de servicio
de una parte a otra.[45] Así, como elemento indispensable
de todo contrato, la causa ha de existir, ha de ser
lícita y también verdadera.[46] La causa de un contrato es
ilícita cuando se opone a las leyes o a la moral y al
igual que el contrato sin causa no produce efecto
alguno.[47] Es decir, todo contrato sin causa o con causa
ilícita es nulo. Por consiguiente, "una vez se determina
la ilicitud de la causa, el contrato es nulo e
inexistente".[48]

---

[44] Art. 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3391.

[45] Art. 1226 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3431.

[46] Véanse, Art. 1227 y Art. 1228 del Código Civil, 31 L.P.R.A. secs. 3432 y 3433.

[47] Art. 1227, supra.

[48] Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 182 (1985).

Así, luego de haber examinado el expediente y el derecho aplicable, resulta forzoso concluir que el contrato de corretaje objeto de la controversia que nos ocupa tiene causa ilícita. El recurrido otorgó un contrato de corretaje de préstamo sin tener la licencia requerida por la Ley Núm. 214, *supra*, y con una licencia vencida en cuanto a la profesión que automáticamente lo hubiese excluido del requisito impuesto en la referida ley.

Conforme a lo anterior, la causa del contrato es contraria a la ley. En consecuencia, el contrato es nulo y no obliga a ninguna de las partes. Así, reafirmamos el principio de que permitir que un corredor sin licencia cobre su comisión tiene el efecto de validar la ilegalidad y derrotar casi totalmente la política pública perseguida por el Estado.[49] Por consiguiente, el Dr. Felipe N. Piovanetti García no tiene derecho a cobrar la comisión pactada.

VI.

Es norma reiterada en nuestra jurisdicción que el mecanismo procesal de sentencia sumaria es uno que tiene el propósito fundamental de agilizar la tramitación de los pleitos al eludir la celebración ordinaria de

---

[49] Col. Int'L Sek P.R. Inc. v. Escribá, *supra*, pág. 666. Véase además, G. Palmer, The Law of Restitution, Boston, Ed. Little, Brown and Co., 1978, Vol. II, sec. 8.3, págs. 180-187.

juicios en los méritos.[50] El uso de este mecanismo procede cuando el peticionario establece su derecho con claridad y demuestra la inexistencia de controversias reales sustanciales sobre hechos materiales.[51] Ahora bien, la parte que se opone no debe tomar una actitud pasiva ni descansar solamente en sus alegaciones, es decir, ésta tiene que controvertir la prueba presentada por el peticionario.[52] Sin embargo, aunque la otra parte no se oponga con evidencia que contravenga la presentada por el solicitante, no significa necesariamente que la concesión de la sentencia proceda automáticamente.[53]

La Regla 36.3 de Procedimiento Civil establece que la sentencia sumaria podrá dictarse si de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, surge que no existe una controversia real sustancial en cuanto a ningún hecho material y sólo restaría por resolver una controversia de derecho.[54] Así pues, no procede cuando: (1) existen hechos materiales y esenciales

---

[50] Ramos Pérez v. Univisión Puerto Rico, res. el 3 de febrero de 2010, 2010 T.S.P.R. 15; Toro Avilés v. Puerto Rico Telephone Co., res. el 23 de octubre de 2009, 2009 T.S.P.R. 163; González Aristud v. Hosp. Pavía, 168 D.P.R. 127, 137 (2006).

[51] Íd.

[52] Regla 36.5 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 36.5; Toro Avilés v. Puerto Rico Telephone Co., supra.

[53] Íd.; González Aristud v. Hosp. Pavía, supra, pág. 138.

[54] Regla 36.3 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 36.3.

controvertidos; (2) hay alegaciones alternativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede.[55]

Asimismo, hemos resuelto que la sentencia sumaria procede "aunque se hayan alegado hechos que aparenten estar en controversia, pero cuando el promovente logre demostrar preponderantemente, y mediante dicha prueba documental, que en el fondo no existe controversia sobre los hechos medulares".[56] Por tal razón, la sentencia sumaria procederá si el tribunal concluye que no existen controversias de hechos materiales y esenciales, y como cuestión de derecho debe dictarse la sentencia.

En el presente caso, el Tribunal de Apelaciones entendió que existían varios hechos materiales en controversia, a saber: si hubo aceptación de los términos del financiamiento; si los recurrentes no comparecieron al cierre del contrato de manera unilateral y buscaron evadir el pago de la comisión pactada; si los recurrentes utilizaron la información y negociación obtenida por el señor Piovanetti García para obtener una oferta similar o idéntica con otra

---

[55] Echandi Otero v. Stewart Title Guaranty Co., res. el 22 de Julio de 2008, 2008 T.S.P.R. 126.

[56] Jusino et als. v. Walgreens, 155 D.P.R. 560, 577 (2001). Véase, R. Hernández Colón, Derecho Procesal Civil, 4ta ed., San Juan, Ed. LexisNexis de Puerto Rico, 2007, pág. 237.

institución; y por último, si al momento de los hechos el demandante estaba exento de los requisitos de la ley local para obtener licencia de intermediación financiera, por razón de estar inscrito en el NYSE y NASDAQ. Sin embargo, ninguno de estos hechos controvertidos son materiales ni esenciales.

Los primeros tres hechos a los que el foro apelativo intermedio hace referencia están relacionados con el contrato otorgado, los cuales, a su vez, son inmateriales porque el contrato fue declarado nulo por el Tribunal de Primera Instancia.[57] El foro primario tuvo ante si no sólo las alegaciones de las partes sino que también tuvo el beneficio de contar con prueba documental y deposiciones, con las cuales pudo constatar la inexistencia de hechos esenciales. Así, con la prueba que surge del expediente resulta razonable concluir que el señor Piovanetti García no tenía licencia de intermediación financiera; no estaba exento de cumplir con dicho requisito; y otorgó un contrato de corretaje de préstamo sin estar autorizado por ley, lo que anula el contrato. Es esa conclusión a la que llega el foro primario, la cual en ausencia de pasión, prejuicio, parcialidad o error manifiesto goza de nuestra deferencia.

---

[57] Cabe señalar que el Tribunal de Apelaciones no evaluó dicha determinación del foro primario en los méritos porque se concentró solamente en lo relacionado al dictamen de sentencia sumaria.

Por su parte, el último hecho controvertido planteado por el Tribunal de Apelaciones -si la inscripción en los mercados de NYSE y NASDAQ le eximía del requisito de obtener una licencia- no es una cuestión de hecho sino de derecho, la cual el Tribunal de Primera Instancia resolvió correctamente en la negativa.

Así pues, luego de examinar rigurosamente el expediente del caso de autos, concluimos que así como dictaminó el Tribunal de Primera Instancia, no queda ningún hecho material en controversia y, como cuestión de derecho, procedía que se dictara sentencia sumaria. Por tal razón, el Tribunal de Apelaciones erró al revocar la sentencia sumaria dictada correctamente por el Tribunal de Primera Instancia ante la inexistencia de controversias de hechos materiales y esenciales.

## VII.

En armonía con lo antes señalado, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala la Sentencia del Tribunal de Primera Instancia.

Se dictará Sentencia de conformidad.


Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Dr. Felipe Piovanetti García H/N/C F.P. Morgan & Company<br><br>     Recurrido<br><br>          v.<br><br>Nicolás Touma y Carmen Taveras, y la Sociedad de Gananciales que tienen constituida entre sí, y Roberto Tirado y Aurea Rodríguez de Tirado, y la Sociedad de Gananciales que tienen constituida entre sí<br><br>     Peticionarios | CC-2009-138<br>CC-2009-229 | |

SENTENCIA

En San Juan, Puerto Rico, a 22 de abril de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala la Sentencia del Tribunal de Primera Instancia.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Fiol Matta no intervinieron. La Jueza Asociada señora Pabón Charneco no interviene.

                    Aida Ileana Oquendo Graulau
                 Secretaria del Tribunal Supremo