El Juez Asociado Señor Kolthoff Caraballo
emitió la opinión del Tribunal.
En esta ocasión nos corresponde interpretar por pri-mera vez la Ley Núm. 214 de 14 de octubre de 1995, Ley para Reglamentar el Negocio de Intermediación Financie-ra, (1) y determinar si ésta aplica a un corredor de valores que sin poseer una licencia válida requerida por la referida Ley, gestiona, a cambio de una comisión, un financia-miento. Asimismo, conforme a esas circunstancias debe-mos determinar la validez y exigibilidad del contrato otorgado.
*751 I
El matrimonio compuesto por el Sr. Nicolás Touma y la Sra. Carmen Taveras (matrimonio Touma-Taveras), así como el matrimonio compuesto por el Sr. Roberto Tirado y la Sra. Aurea Rodríguez (matrimonio Tirado-Rodríguez), eran dueños de dos tercios de las acciones de la corporación Victory Insurance Corporation. Cada matrimonio era dueño de un tercio. El tercio restante era propiedad del matrimonio compuesto por el Sr. Rafael Claudio y la Sra. Norma Figueroa (matrimonio Claudio-Figueroa).
Los matrimonios Touma-Taveras y Tirado-Rodríguez (aquí recurrentes) deseaban comprar las acciones del ma-trimonio Claudio-Figueroa mediante lo que se conoce como un “buy out”. Así pues, ambos matrimonios contrataron al Dr. Felipe N. Piovanetti García (recurrido) para que gestio-nara, a través de instituciones financieras, la obtención de un préstamo para poder adquirir las acciones del matrimo-nio Claudio-Figueroa. El señor Piovanetti García, h/n/c F.P. Morgan & Company, se desempeñaba como corredor de va-lores especializado en gestionar financiamientos corporati-vos a través de instituciones financieras.
El acuerdo final entre el recurrido y los recurrentes se perfeccionó el 22 de enero de 1998 mediante un contrato de servicios “Contract Fee Agreement”. En dicho acuerdo se estableció que el señor Piovanetti García sería el responsa-ble de gestionar reuniones entre las instituciones financie-ras y ambos matrimonios, así como a estar presente en éstas con el fin de lograr la concesión del financiamiento deseado. A su vez, éste obtendría una comisión por el co-rretaje del préstamo de un 3% de la suma financiada.
El recurrido realizó las gestiones encomendadas y logró que el Banco Scotiabank de Puerto Rico (Banco) le hiciera una oferta de préstamo a ambos matrimonios por $4,300,000. El 11 de marzo de 1998 el Banco emitió los *752 documentos, en los cuales expuso los términos y las condi-ciones del financiamiento (“Term Sheets”) para la evalua-ción y posterior tramitación del préstamo. Dicho docu-mento exigía el pago de $70,000 a ser pagados en un 50% al momento de la firma del “Term Sheet”, y el restante 50% al momento del cierre o firma del contrato de financiamiento. El 13 de marzo de 1998, ambos matrimo-nios suscribieron los referidos “Term Sheets” y realizaron el primer pago de $35,000.
Sin embargo, posteriormente ambos matrimonios —Touma-Taveras y Tirado-Rodríguez— rechazaron la oferta del Banco y no acudieron al cierre del financia-miento, por lo que nunca realizaron el segundo pago de $35,000.(2)
Así las cosas, el 31 de diciembre de 1998 el señor Piova-netti García presentó una demanda sobre sentencia decla-ratoria, incumplimiento de contrato y daños y perjuicios ante el Tribunal de Primera Instancia. En su causa de ac-ción éste alegó que había cumplido con todas sus obligacio-nes conforme a lo pactado en el contrato. Además, expuso que los recurrentes se habían obligado a aceptar todos los términos y condiciones del financiamiento, al suscribir los “Term Sheets” del Banco y al pagar $35,000 como pago ini-cial de la obligación convenida. Por consiguiente, alegó una deuda por honorarios ascendente a $129,000, equivalente al 3% pactado en el contrato, y reclamó una suma adicio-nal, no menor de $100,000 por daños.
Por su parte, desde los inicios del pleito ambos matri-monios demandados solicitaron la desestimación de la de-manda al amparo de la Regla 36.2 de Procedimiento Civil,(3) porque, entre otras cosas, el señor Piovanetti García no tenía licencia para realizar los servicios de intermedia- *753 ción financiera conforme lo establece la Ley para Regla-mentar el Negocio de Intermediación Financiera.
Tras varios procedimientos, el 7 de octubre de 2008 el Tribunal de Primera Instancia (T.P.I.) emitió sentencia su-maria y desestimó la demanda del señor Piovanetti García. Concluyó el T.P.I. que el contrato suscrito entre las partes tenía causa ilícita porque el señor Piovanetti García no estaba facultado en ley para dedicarse al negocio de inter-mediación financiera. Por otro lado, el T.P.I. señaló que ambos matrimonios demandados debieron haber conocido que el demandante no tenía licencia para fungir como in-termediario, por lo que no les asistía el derecho a recobrar los $35,000 adelantados.(4)
Inconforme, el recurrido presentó un recurso de apela-ción ante el Tribunal de Apelaciones, alegando que el T.P.I. había cometido ocho errores, los cuales principalmente se fundamentaron en la alegación de que se había interpre-tado erróneamente el contrato. Además, argüyó que el foro primario ignoró que las personas inscritas en los mercados de valores “New York Stock Exchange” (NYSE) y “National Association of Securities Dealers Automated Quotation” (NASDAQ) están exentas de los requisitos de obtener li-cencias de valores y para el negocio de intermediación fi-nanciera en Puerto Rico. Además, el señor Piovanetti Gar-cía sostuvo que la definición que hace la ley que reglamenta la intermediación financiera en Puerto Rico excluye los asesores de inversiones y corredores-traficantes de valores.
El 15 de diciembre de 2008 el Tribunal de Apelaciones revocó el dictamen del Tribunal de Primera Instancia por entender que ante la existencia de varios hechos materia-les en controversia no procedía el dictamen de sentencia sumaria. Según explicó, los hechos controvertidos eran los *754 siguientes: determinar si hubo aceptación de los términos del financiamiento; si los recurrentes no comparecieron al cierre del contrato de manera unilateral y buscaron evadir el pago de la comisión pactada; si los recurrentes utilizaron la información y negociación obtenida por el señor Piova-netti García para obtener una oferta similar o idéntica con otra institución, y por último, si al momento de los hechos el demandante estaba exento de los requisitos de la ley local para obtener licencia de intermediación financiera, por estar inscrito en el NYSE y NASDAQ.
Inconformes, los matrimonios Touma-Taveras y Tirado-Rodríguez presentaron oportunamente sus respectivas mo-ciones de reconsideración. Sin embargo, el Tribunal de Apelaciones denegó ambas mociones. Así pues, los matri-monios Touma-Taveras y Tirado-Rodríguez presentaron oportunamente sus respectivos recursos de certiorari ante este Tribunal y plantearon la comisión de errores similares. El matrimonio Touma-Taveras expresó:
1. Erró el Tribunal de Apelaciones al interpretar que mías inscripciones en NYSE y NASDAQ que supuestamente tiene el recurrido podrían eximirlo de cumplir con el requisito sine qua non de poseer una licencia expedida por OCIF que dispone la Ley para reglamentar el negocio de intermediación financiera.
2. Erró el Tribunal de Apelaciones al devolver el caso a ins-tancia para que determinara en sus méritos un asunto sobre el cual no existe controversia real sustancial, a saber: el recu-rrido no tiene licencia para fungir como intermediador finan-ciero en PR, y, consecuentemente, el contrato otorgado entre las partes tiene causa ilícita. Petición de certiorari, CC-2009-0138, pág. 4.
Del mismo modo, el matrimonio Tirado-Rodríguez plan-teó en su recurso lo siguiente:
Erró el TA al concluir que el recurrido se encontraba eximido de cumplir con la autorización de OCIF para ejercer como co-rredor de préstamos al momento de perfeccionamiento del Contrato con los recurrentes.
*755 Erró el TA al concluir que no procedía resolverse sumaria-mente el caso sin celebrase una vista en los méritos. (Énfasis suprimido.) Petición de certiorari, CC-2009-0229, págs. 8 y 13.
El 28 de agosto de 2009 ordenamos la consolidación de ambos recursos y le concedimos a la parte recurrida el tér-mino de 20 días para que compareciera y mostrara causa por la cual no debíamos modificar la sentencia dictada por el Tribunal de Apelaciones. En cumplimiento de nuestra orden, el Dr. Felipe N. Piovanetti García compareció por escrito. Así pues, con ambos casos consolidados y con el beneficio de las comparecencias de las partes, expedimos el recurso y procedemos a resolver.
II
En varias ocasiones este Tribunal ha atendido controversias relativas al contrato de corretaje, el cual he-mos definido como aquel “por el cual uno se obliga a pagar a otro (el corredor) una remuneración (la comisión) por la información de la ocasión para concluir un contrato o por la mediación en un contrato”. (5) Es decir, a través de esta figura contractual una persona (el comitente) promete a otra (el corredor) una retribución o comisión por indicar la ocasión para celebrar un contrato o simplemente por mediar en el mismo, cualquiera que éste sea (compraventa, transporte, préstamo, seguro, etc.).(6)
El contrato de corretaje ha sido descrito como atípico, innominado, principal, consensual y puede ser bilateral o unilateral, según resulten obligadas cada una de las *756 partes.(7) Sobre ello hemos resuelto que este tipo de con-trato, por no estar regulado expresamente en nuestro Có-digo Civil, se regula en primer lugar por lo acordado entre las partes y, en su defecto, se rige por las disposiciones generales relativas a los contratos y aquellas reglas aplica-bles a los contratos afines, en particular el mandato.(8) Por consiguiente, en ausencia de disposiciones expresas que re-gulen el contrato de corretaje, nuestra jurisprudencia ha ido delimitando las consecuencias y características de dicho contrato.
En torno a las principales consecuencias que derivan del contrato de corretaje, en Col. Int’l Sek P.R., Inc. v. *757 Escribá, 135 D.P.R. 647, 656 (1994), acogimos los pensa-mientos del tratadista Puig Peña, a saber:
a) Que lo característico de la actuación del mediador con-siste en que se limita a poner en relación directa o indirecta a los futuros contratantes, sin participar él personalmente en el contrato, no como representante de una de las partes, ni como simple mandatario o comisionista suyo; es decir, queda siem-pre fuera del contrato resultante de su actividad.
b) Que es de esencia al contrato de corretaje la existencia de un premio o retribución. (Énfasis en el original.)(9)
Así pues, los elementos reales de este tipo de contrato son el servicio de mediación, el cual ha de ser determinado y lícito, y la comisión.(10) La cuantía de esta última dependerá de lo pactado entre las partes, salvo que esté sometida a regulación del Estado.(11)
Ahora bien, como norma general el corredor no tiene derecho a la comisión si no se celebra o perfecciona el contrato encargado.(12) Por lo tanto, el derecho del corredor a recibir la comisión pactada surge una vez el contrato ha sido perfeccionado, salvo pacto en contrario que requiera la consumación. (13) No obstante, en Col. Int’l Sek P.R., Inc. v. Escribá, supra, págs. 656-657, citando el caso Torres v. Arbona, Jr, 72 D.P.R. 769, 778 (1951), aclaramos con relación al derecho que tiene el corredor a cobrar la comisión que:
La jurisprudencia americana se pronuncia casi unánime-mente en el sentido de que en casos de esta índole basta que el corredor a quien se ha encomendado la venta de determinada propiedad encuentre un comprador dispuesto, deseoso y en condiciones económicas de comprar {ready, willing and able) para que el corredor tenga derecho a la comisión, así como en el sentido de que cuando existiere el pacto de que el corredor *758 tendrá derecho a su comisión cuando quede consumado el con-trato, el derecho a la comisión subsiste en aquellos casos en que la no consumación sea debido al fraude, culpa o mala fe del vendedor. Desde luego, si el corredor o presunto comprador tenían conocimiento de los defectos o vicios de que adolecía la cosa el vendedor no es responsable, puesto que entonces no puede imputársele mala fe, culpa o negligencia. (Citas y esco-lios omitidos.)
De hecho, tanto la jurisprudencia federal como la tradición civilista han reconocido que el derecho del corredor a cobrar la comisión pudiera subsistir en situaciones en las cuales no ocurra el perfeccionamiento o consumación del contrato. Ello es así, en instancias en las cuales dicha actuación haya sido ocasionada por el vendedor o comitente y sin mediar razones justificadas. Por ejemplo, el Tribunal Supremo de Estados Unidos, citando el Art. 2040 del Código Civil de Luisiana —análogo al Art. 1072 de nuestro Código Civil— expresó que el derecho a la comisión subsiste aun cuando el vendedor se niega a cumplir con el acuerdo sin razones justificadas.(14)
Asimismo, la doctrina civilista española ha reconocido algunas instancias en las cuales el derecho a la remunera-ción subsiste aunque el contrato celebrado por la media-ción del corredor no llegue a consumarse. Conforme a ello, se ha entendido que el derecho a la remuneración “no puede enervarse por el desistimiento unilateral del vendedor”.(15)
A pesar de lo antes expuesto, los hechos particulares del caso de autos requieren que inicialmente determinemos si aplican al Dr. Felipe N. Piovanetti García las disposiciones *759 de la Ley Núm. 214 de 14 de octubre de 1995, la cual re-glamenta el negocio de intermediación financiera. En con-secuencia, debemos determinar si el contrato por él otor-gado es válido y, por ende, si él tiene derecho a cobrar la comisión pactada, aun cuando no se haya perfeccionado el contrato encargado.
III
A. Es altamente conocido que el Estado, como parte de su poder de razón de estado, tiene la facultad para reglamentar las profesiones, fundamentado en razones de alto interés público como la salud, la seguridad y el bienestar general.(16) Por tal razón, a través de los años se ha reglamentado la industria financiera por ésta estar revestida de un alto interés público, económico y social. Así, como parte de los estatutos que regulan dicha industria, se crea la Ley Núm. 214 de 14 de octubre de 1995, conocida como la Ley para Reglamentar el Negocio de Intermediación Financiera, según enmendada. Esta Ley tiene como propósito el reglamentar, supervisar y fiscalizar las instituciones y personas que, abierta o solapadamente, realizan negocios de intermediación financiera —como prestamistas, agentes, planificadores, consultores o asesores financieros, corredores o intermediarios de otros tipos de préstamos y financiamientos— sin estar autorizados a tales fines por ley o reglamento.(17)
Con la aprobación de la referida Ley Núm. 214, la Asamblea Legislativa extendió la jurisdicción de la Oficina del Comisionado de Instituciones Financieras (O.C.I.F.) para reglamentar, supervisar y fiscalizar a las instituciones, entidades y personas que realizan negocios de inter- *760 mediación financiera. Ello, con el propósito de evitar que, ante el auge de este tipo de negocio en Puerto Rico, la ciu-dadanía sufriera los efectos del engaño y el fraude por parte de aquellos que ofrecen este tipo de servicios.(18) El legislador expresó específicamente que, “[c]omo resultado de estos ofrecimientos y debido a las necesidades y, en mu-chos casos, a la desesperación de algunas personas, éstas se han convertido en víctimas inocentes de personas ines-crupulosas que con el pretexto de brindarle una solución a sus problemas económicos, las han hecho presas del en-gaño y el fraude”.(19) Por tal razón, el poder legislativo en-tendió necesario y conveniente obligar a toda entidad o persona que pretenda realizar negocios de intermediación financiera estar autorizado para ello.(20) Así pues, es evi-dente que el propósito primordial de la Ley es la protección del consumidor.
La Ley Núm. 214 requiere que toda persona —salvo aquellas expresamente exentas de su cumplimiento— obtenga una licencia, a ser expedida por la O.C.I.F., previo a ofrecer servicios de intermediación financiera.(21) La obtención de dicha licencia conlleva el pago de derechos y cuotas anuales que varían según el volumen de negocios y el número de oficinas que tenga el concesionario(22) Ade- *761 más, entre otras cosas, la Ley exige la prestación de una fianza y mantener cierto capital líquido para responder por el fiel cumplimiento de las obligaciones del negocio. (23) Cabe señalar que la Ley establece que violar sus disposi-ciones o los reglamentos promulgados en virtud de ésta podría constituir un delito menos grave o grave. Entre las posibles violaciones se encuentra fungir como intermedia-rio financiero sin tener licencia para ello y, solicitar, recibir o cobrar por adelantado el pago total o parcial de cualquier comisión o cargo por los servicios a ser prestados, aun con licencia de intermediario(24)
Ahora bien, el Art. 3 de la Ley Núm. 214, supra, 7 L.P.R.A. see. 1072, dispone que ésta “aplicará a toda persona que ofrezca o preste servicios como corredor de préstamos y financiamientos y a todo prestamista, agente planificador financiero, consultor o asesor financiero”, según estos términos son definidos en la Ley. Por ende, para comprender la aplicabilidad y extensión de la Ley debemos analizar las definiciones pertinentes al caso de autos.
El término negocio de intermediación financiera se define específicamente en el Art. 2(a), el cual dispone:
Negocio de intermediación financiera — Significa e incluye ofrecer servicios o dedicarse a actividades de planificación, consultoría o asesoramiento financiero, concesión de présta-mos, corredor de préstamos hipotecarios sobre bienes inmue-bles o corredor de otros tipos de préstamos y financiamientos, mediante contacto personal, telefónico o escrito, o mediante anuncios en periódicos, publicaciones, hojas sueltas, rótulos, cruzacalles, guía telefónica, radio, televisión o a través de cualquier otro medio similar, a prestar dichos servicios a una persona que no sea su pariente dentro del cuarto grado de con- *762 sanguinidad o segundo grado de afinidad, y que la prestación de dichos servicios requiera el pago de un cargo por servicio o comisión por parte de la persona para quien se gestiona, tra-mita, planifica, concede u obtiene el préstamo o financiamiento.
Incluye, además, ofrecer planes o servicios para reducir el pago de intereses o el término de préstamos hipotecarios sobre bienes inmuebles mortgage reduction plans. Este término no incluye a los agentes, corredores traficantes, consultores o ase-sores de inversiones y valores cubiertos por la Ley Núm. 60 de 18 de junio de 1963, según enmendada, y la Ley Núm. 6 de 19 de octubre de 1954, según enmendada, conocidas respectiva-mente como “Ley Uniforme de Valores de Puerto Rico”y “Ley de Compañías de Inversiones de Puerto Rico”, ni a un abogado, contable, economista, ingeniero o maestro cuya prestación de estos servicios sea meramente incidental al ejercicio de su profesión. (Énfasis suplido.)(25)
De la definición anterior se desprende que el término incluye a toda persona dedicada a actividades de planifica-ción, consultoría, asesoramiento financiero, concesión y co-rretaje de préstamos, que presten sus servicios a personas fuera de su cuarto grado de consanguinidad y segundo grado de afinidad, y que, a su vez, cobren cargos o comisio-nes por la prestación de dichos servicios. Sin embargo, los agentes, corredores traficantes, consultores o asesores de inversiones y valores, cubiertos por la Ley Uniforme de Va-lores o la Ley de Compañías Financieras, así como los abo-gados, contables, economistas, ingenieros y maestros, cuya prestación de los servicios antedichos sea meramente incidental al ejercicio de su profesión, están exentos de esta definición.
Por otro lado, el Art. 3 de dicha Ley dispone ciertas exclusiones adicionales, las cuales están sujetas a la prohibición de cobrar por los servicios de intermediación financiera. Dicho artículo dispone lo siguiente:
(b) Exclusiones. Esta [Ley] no aplicará a cualquier persona que actúe en su capacidad de dueño, socio, director, oficial, *763 agente o empleado de cualquier negocio autorizado por ley tales como: bancos, asociaciones y bancos de ahorro y préstamos, compañías de financiamiento, financieras, instituciones hipo-tecarias y otras similares cuya actividad principal sea el con-ceder préstamos o financiamientos, con licencia para ello.
Tampoco aplicará a aquella persona que como dueño, socio, director, oficial, agente o empleado se dedique a cualquier ne-gocio en que la obtención de préstamos o financiamientos para los clientes de dicho negocio sea inherente, incidental o nece-sario al mismo, tales como los negocios de venta o arrenda-miento de bienes y servicios.
El Fideicomiso de Vivienda y Desarrollo Humano de Puerto Rico, según el mismo ha sido creado y es operado bajo la Es-critura Núm. 135 del 7 de mayo de 2004, otorgada ante el Notario José Orlando Mercado Gely, está exento de la aplica-ción de esta ley.
(c) Prohibiciones. Las personas excluidas de la aplicación de esta ley, descritas en el inciso [anterior], podrían dedicarse al negocio de intermediación financiera sin licencia para ello, ex-clusivamente para beneficio de su institución, pero al hacerlo no podrán cobrarle comisión o cargo alguno por dichos servi-cios en su carácter personal. (Enfasis suplido.)(26)
De la disposición antedicha puede colegirse que a las personas que se dediquen a cualquier negocio en que la obtención de préstamos o financiamientos para los clientes de dicho negocio sea inherente, incidental o necesario a éste, no les aplica el referido estatuto. Tampoco aplica a quienes actúen en representación de entidades financieras cuyo propósito principal sea el conceder préstamos o finan-ciamientos, con licencia para ello. Sin embargo, el inciso (c) señala claramente que las personas excluidas por el inciso (b) podrían realizar funciones de intermediación financiera con la condición de que sea para beneficio de la institución para la cual trabajan y no podrán cobrar cargo o comisión alguna para su persona por la prestación de dichos servicios.
En otras palabras, la Ley Núm. 214 dispone dos tipos de exclusiones, la que surge del Art. 2 y la que proviene del *764 Art. 3, supra. En torno a la primera exclusión, la cual surge de la definición del término negocio de intermedia-ción financiera, es claramente palpable que establece una lista taxativa de profesionales exentos. En cambio, la ex-clusión que proviene del Art. 3 es más abarcadora al apli-car a cualquier persona que cumpla con los requisitos allí dispuestos. Sin embargo, los efectos en ambas exclusiones son distintos.
La exclusión proveniente del Art. 3 está sujeta a la limi-tación provista en el inciso (c) del propio artículo, el cual dispone que las personas excluidas en el inciso (b) pudie-ran dedicarse al negocio de intermediación financiera sin licencia para ello, exclusivamente para beneficio de su ins-titución y sin derecho a cobrar una comisión o cargo en su carácter personal.
Al contrario, los profesionales excluidos de la definición del Art. 2 podrían brindar servicios de intermediación fi-nanciera y cobrar por ello. No obstante, opinamos que la referida exclusión refleja distintas derivaciones, es decir, la exclusión no opera de forma similar para los profesionales allí enunciados. Lo dispuesto en el Art. 2 demuestra dos grupos de profesionales excluidos, los que están cubiertos por la Ley Uniforme de Valores y la Ley de Compañías Financieras, y los demás.
Los profesionales que componen el primer grupo —los agentes, corredores traficantes, consultores o asesores de inversiones y valores, cubiertos por las leyes antecedidas— están exentos de cumplir con las disposiciones de la Ley Núm. 214. Lo anterior se sustenta en el hecho de que estos profesionales realizan funciones análogas a las de interme-diación financiera, además de estar sometidos a regulación estatal a través de las leyes de valores y compañías financieras.(27) Así pues, entendemos que la clara intención *765 legislativa es que los referidos profesionales —cubiertos por la Ley Uniforme de Valores y la Ley de Compañías Financieras— estén exentos totalmente de la aplicación de la Ley Núm. 214.
En cambio, el legislador expresó que existen profesiona-les, que aunque ajenos a este tipo de negocio, podrían pres-tar estos servicios incidentalmente y cobrar por ello. Por tal razón, a los abogados, contables, economistas, ingenie-ros y maestros, el legislador les aplicó una exención más limitada, por lo que éstos podrían practicar la intermedia-ción financiera de forma incidental al ejercicio de su profesión. (28)
B. Ahora bien, el legislador dejó claro que el propósito de la Ley Núm. 214 no es regular y fiscalizar al profesional que se dedica a la consultoría y ofrecimiento de servicios de asesoramiento financiero pero que nunca sirve de intermediario para propósitos de préstamos.(29) Más bien, el fin primordial de dicho estatuto es regular el ejercicio de la intermediación de préstamos y financiamientos en aras de proteger al consumidor. Conforme a ello, la Ley dispone que el término negocio de intermediación financiera incluye los servicios o actividades de planificación, consultoría o asesoramiento financiero, la concesión de préstamo y el corretaje de préstamos y financiamientos. El Art. 2 define varios de estos servicios y funciones, entre los cuales se encuentra el corredor de préstamos y financia- *766 mientos, término que se define en el inciso (d) de la forma siguiente:
Significa cualquier individuo, corporación, sociedad, firma o entidad no incorporada, con o sin fines de lucro, que ofrece y contrata sus servicios para gestionar, tramitar u obtener prés-tamos hipotecarios sobre bienes inmuebles u otros tipos de préstamos y financiamientos para terceras personas a cambio de un cargo por servicio que puede ser directo, indirecto, ostensible, oculto o disfrazado.(30)
Asimismo, como complemento a la Ley, la O.C.I.F. promulgó el Reglamento Núm. 5721 en conformidad con las disposiciones del Art. 16 de la Ley Núm. 214 (7 L.RR.A. see. 1085).(31) Este reglamento rige a toda persona o agente que actúe como corredor o intermediario en la tramitación de préstamos hipotecarios o personales, entre otros servicios, a cambio de una comisión, honorario o cargo.(32) Conforme a lo anterior, evidentemente la Ley y el Reglamento hacen referencia a la tramitación de préstamos como una de las funciones principales del corredor de préstamos y que ciertamente la Ley pretende regular. Además, el Reglamento de O.C.I.F. Núm. 5721 brinda más claridad al respecto al definir el término tramitación de préstamos como
... cualquier gestión en beneficio de o en representación de otros que lleve a cabo cualquier persona, incluyendo procesar toda la documentación necesaria para obtener un préstamo, a ser financiado por cualquier persona autorizada a conceder préstamos mediante el cobro de una comisión u honorario.(33)
Así pues, si una persona desea brindar servicios *767 como corredor de préstamos y, por ende, tramitar présta-mos, debe poseer la licencia establecida en la Ley, salvo las excepciones que ya hemos discutido. No obstante, en el caso de los profesionales excluidos en el Art. 2, los agentes, corredores traficantes, consultores o asesores de inversio-nes de valores cubiertos por la Ley de Uniforme de Valores o la Ley de Compañías Financieras podrían ejercer las fun-ciones de corredor de préstamos sin más, contrario a los abogados, contables, economistas, ingenieros y maestros, quienes podrían ejercer dichas funciones sólo de forma incidental a su profesión principal.
C. Es principio reiterado que “|c]uando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”. (34) De esta forma, cuando el texto de la ley es claro e inequívoco es la expresión por excelencia de la intención legislativa.(35) Así, en instancias en las cuales la letra de la ley es clara no hay necesidad de indagar más allá de ella como pretexto para cumplir con su intención legislativa. (36)
 Sin embargo, el Código Civil establece tam-bién la importancia de tomar en cuenta la voluntad del legislador al momento de interpretar las disposiciones de una ley. A esos efectos, el Art. 19 del Código Civil(37) dis-pone que “ [e]l medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla”. En ese sentido, hemos expresado que “al descar-gar nuestra función de interpretar una disposición particular de un estatuto, debemos siempre considerar cuáles fue- *768 ron los principios perseguidos por la Asamblea Legislativa al aprobarla, de manera tal que su interpretación asegure el resultado que originalmente se quiso obtener”.(38)
D. Con ello en mente, al examinar la letra de la Ley Núm. 214, su Exposición de Motivos, el historial legislativo y el Reglamento, resulta forzoso concluir que la Asamblea Legislativa excluyó de forma absoluta a los agentes, corre-dores traficantes, consultores o asesores de inversiones cu-biertos por la Ley Uniforme de Valores y la Ley de Compa-ñías Financieras. Por lo tanto, éstos podrían practicar el negocio de intermediación financiera sin necesidad de ob-tener la licencia exigida por la Ley Núm. 214.
IV
En los casos de autos, el Dr. Felipe N. Piovanetti García y los matrimonios Tirado-Rodríguez y Touma-Taveras sus-cribieron un contrato, mediante el cual, el recurrido se obligó a tramitar un préstamo a favor de ambos matrimo-nios a cambio de una comisión del 3% de la cuantía financiada. En dicho contrato se estableció que los térmi-nos del financiamiento debían ser razonables y aceptados por los matrimonios, y que la comisión iba a ser exigible una vez se produjera el cierre del préstamo. Por ende, es evidente que estamos ante un típico contrato de corretaje, por el cual el señor Piovanetti García se obligó a gestionar préstamos con el fin de lograr un contrato entre los matri-monios y un banco o institución financiera que no es parte del contrato a cambio del pago de una comisión.
Ahora bien, claramente el contrato de corretaje de prés-tamos está regulado por la referida Ley de Intermediación Financiera. Ello tiene la consecuencia de que para poder realizar este tipo de gestión se tiene que cumplir con los *769 requisitos que impone la Ley. Así, para poder realizar ges-tiones como corredor de préstamos y cobrar por ello, es necesario tener una licencia por parte de la O.C.I.F. o estar claramente eximido por la ley. Por lo tanto, nos corres-ponde determinar si la actuación del señor Piovanetti Gar-cía estaría cubierta por algunas de las exenciones expuestas.
El Dr. Felipe N. Piovanetti García se desempeñaba como corredor de valores especializado en gestionar finan-ciamientos corporativos a través de instituciones financieras. Realizaba funciones típicas del negocio de in-termediación financiera. Sin embargo, al momento de la perfección del contrato de corretaje éste no contaba con licencia ni para actuar como corredor de valores ni para realizar negocios de intermediación financiera. Según surge del expediente, la O.C.I.F. certificó que para la fecha en se perfeccionó el contrato el recurrido no estaba regis-trado para llevar a cabo negocios como corredor según las disposiciones de la Ley Uniforme de Valores. En dicha cer-tificación, del 21 de mayo de 2002, la Sra. Myrta Vélez, Supervisora de la División de Valores de la O.C.I.F., señaló que la inscripción del recurrido fue efectiva entre abril de 1981 y enero de 1997.
Por otro lado, la O.C.I.F. expide una segunda certifica-ción el 15 de agosto del mismo año a través del subcomi-sionado, Sr. Antonio Salvá. En ella, se certificó que la ins-cripción del señor Piovanetti García, mencionada en la primera certificación, nunca había sido revocada, suspen-dida o cancelada por dicha Oficina. Es esta última certifi-cación la que el recurrido utiliza para demostrar su ins-cripción y no es menos cierto que parecería existir una contradicción entre ambas certificaciones. Sin embargo, el asunto fue aclarado por la señora Vélez mediante testimo-nio en deposición. Ella indicó que lo expresado en la se-gunda certificación se refería al término en el cual el recu-rrido estuvo inscrito.
*770 En consecuencia, quedó evidenciado, tanto con las certi-ficaciones como con el testimonio de la Sra. Myrta Vélez, que para la fecha en que el señor Piovanetti García realizó el contrato de corretaje no estaba inscrito en la O.C.I.F. como agente inversor conforme a lo dispuesto en la Ley Uniforme de Valores. Su inscripción como corredor de va-lores había vencido en enero de 1997, por tal razón no es-taba cubierto por la referida Ley de Valores al momento de otorgar el contrato.
Además, de las propias alegaciones del señor Piovanetti García, así como del expediente surge que éste nunca ha-bía obtenido la licencia para actuar como intermediario financiero. El 22 de mayo de 2003 la O.C.I.F. certificó que hasta ese momento el recurrido no poseía licencia para operar según las disposiciones de la Ley Núm. 214, ni du-rante el periodo comprendido entre el 7 de enero de 1998 y el 28 de febrero de 1999.
Por otro lado, el señor Piovanetti García también alegó que por ser corredor de valores inscrito en los mercados NYSE y NASDAQ, la ley local le exime de cumplir con los requisitos para obtener la licencia de valores y, en especí-fico, para el negocio de intermediación financiera. No le asiste la razón.
En primer lugar, del expediente no surgen las referidas inscripciones que éste alega tener. Al mismo tiempo, aun si tomáramos como cierta su inscripción en NYSE y NASDAQ, ese hecho por sí solo no le exime de cumplir con la Ley. Para sustentar su alegación, el recurrido utiliza como fundamento el Art. 2 de la Ley Núm. 214, supra, y la se-gunda certificación de la O.C.I.F. Sin embargo, ninguna de las dos fuentes utilizadas sostiene su alegación. En la cer-tificación de la O.C.I.F., a la que el recurrido hace referen-cia, sólo se expresa que su inscripción como agente de in-versiones nunca fue revocada, suspendida o cancelada. Sin embargo, como ya hemos señalado, dicha certificación se refería al término en que éste estuvo inscrito, es decir, *771 desde abril de 1981 hasta enero de 1997. Por consiguiente, la referida certificación nada expone que justifique la ale-gación del señor Piovanetti García.
Asimismo, el Art. 2 de la Ley Núm. 214, supra, tampoco sostiene la alegación del recurrido. Como también hemos indicado, el referido artículo exime del cumplimiento de la Ley sólo a los corredores y asesores de valores que estén cubiertos por la Ley Uniforme de Valores y la Ley de Com-pañías de Inversiones. Además, la Ley Núm. 214 nada dis-pone sobre alguna exención que establezca que las perso-nas inscritas en los mercados de valores NYSE y NASDAQ no necesitan la autorización de la O.C.I.F. para ejercer el negocio de intermediación financiera en Puerto Rico.
Ahora bien, es principio axiomático que una licencia suspendida o vencida carece de validez.(39) Ello implica que el poseer una licencia vencida equivale a no tener licencia. En el caso de autos, de la prueba surge que el recurrido tenía su licencia de agente de inversiones vencida. Por lo tanto, como el señor Piovanetti García no tenía la licencia requerida por la Ley Uniforme de Valores para ejercer como agente de inversiones, claramente no le aplica la exención de la Ley Núm. 214.
La política pública que fundamenta la Ley Núm. 214 radica en el interés del Estado de proteger a la ciudadanía y garantizar a los consumidores que las personas que po-sean una licencia para ejercer como intermediarios finan-cieros tengan la capacidad y la solvencia moral para reali-zar dichas funciones.(40) Así como los profesionales cubiertos al amparo de la Ley Uniforme de Valores y la Ley de Compañías Financieras —excluidos de la Ley Núm. 214— están regulados estatalmente por las referidas leyes, el consumidor no queda desprovisto de protección. Además, sería un contrasentido que una persona sin licencia de co- *772 rredor o agente de inversiones válida utilice simplemente el nombre de su profesión para obtener la exención. Ello tendría el efecto de soslayar el cumplimiento de ambas le-gislaciones y el fin público perseguido.
El señor Piovanetti García ha sostenido desde el inicio del pleito que no fue contratado como corredor de valores, agente o asesor de inversiones.(41) Es más, alegó que sus gestiones no tenían nada que ver con compraventas de va-lores o inversiones, más bien su única función era gestio-nar el financiamiento requerido.(42)
Así pues, a todas luces el único propósito del contrato suscrito por el recurrido fue el de gestionar un financiamiento. Su labor fue única y exclusivamente diri-gida a gestionar un préstamo por el cual cobraría una comisión. Por consiguiente, utilizó su título profesional como subterfugio para realizar funciones de intermedia-ción financiera sin tener licencia para ello y sin estar ex-presamente exento.
V
Interpretando una situación similar a la que nos ocupa, en el caso Col. Int’l Sek P.R., Inc. v. Escribá, supra, tuvimos la oportunidad de expresarnos en tomo a la validez de un contrato de corretaje de bienes raíces cuando el corredor no tenía licencia para ejercer la profesión. En el referido caso se había pactado el pago de una comisión a un corredor a cambio de que éste realizara unas gestiones que lograran la venta de unos terrenos. Una vez realizada la compra-venta entre los dueños originales y los compradores, pro- *773 ducto de la mediación del corredor, los dueños originales se negaron a pagarle la comisión.
En aquella ocasión al aplicar la Ley Núm. 10 del26 de abril de 1994, conocida como la Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Ven-dedor o Empresa de Bienes Raíces en Puerto Rico, deter-minamos que por el corredor no contar con la licencia que dicho estatuto requería, éste no tenía derecho al cobro de la comisión. Ello, porque al no tener licencia de corredor de bienes raíces y fungir como tal, violó la ley y, en consecuen-cia, el contrato adolecía de causa ilícita. En otras palabras, el contrato era nulo.
Es principio reiterado que los elementos constitutivos de un contrato son el consentimiento, el objeto y la causa.(43) La causa, en los contratos onerosos, se ha entendido como la prestación o promesa de servicio de una parte a otra.(44) Así, como elemento indispensable de todo contrato, la causa ha de existir, ha de ser lícita y también verdadera.(45) La causa de un contrato es ilícita cuando se opone a las leyes o a la moral y al igual que el contrato sin causa no produce efecto alguno.(46) Es decir, todo contrato sin causa o con causa ilícita es nulo. Por consiguiente, “una vez determinada la ilicitud de la causa, el contrato es nulo e inexistente”.(47)
Así, luego de haber examinado el expediente y el dere-cho aplicable, resulta forzoso concluir que el contrato de corretaje objeto de la controversia que nos ocupa tiene causa ilícita. El recurrido otorgó un contrato de corretaje de préstamo sin tener la licencia requerida por la Ley Núm. 214 y con una licencia vencida en cuanto a la profe- *774 sión que automáticamente lo hubiese excluido del requisito impuesto en la referida ley.
Conforme a lo anterior, la causa del contrato es contra-ria a la ley. En consecuencia, el contrato es nulo y no obliga a ninguna de las partes. Así, reafirmamos el principio de que permitir que un corredor sin licencia cobre su comisión tiene el efecto de validar la ilegalidad y derrotar casi total-mente la política pública perseguida por el Estado.(48) Por consiguiente, el Dr. Felipe N. Piovanetti García no tiene derecho a cobrar la comisión pactada.
VI
Es norma reiterada en nuestra jurisdicción que el mecanismo procesal de sentencia sumaria tiene el propósito fundamental de agilizar la tramitación de los pleitos al eludir la celebración ordinaria de juicios en los méritos.(49) El uso de este mecanismo procede cuando el peticionario establece su derecho con claridad y demuestra la inexistencia de controversias reales sustanciales sobre hechos materiales.(50) Ahora bien, la parte que se opone no debe tomar una actitud pasiva ni descansar solamente en sus alegaciones, es decir, ésta tiene que controvertir la prueba presentada por el peticionario.(51) Sin embargo, aunque la otra parte no se oponga con evidencia que contravenga la presentada por el solicitante, no significa necesariamente que la concesión de la sentencia proceda automáticamente. (52)
*775 La Regia 36.3 de Procedimiento Civil establece que la sentencia sumaria podrá dictarse si de las “alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, [surge que no existe] una controversia real sustancial en cuanto a ningún hecho material” y sólo restaría por resolver una controversia de derecho.(53) Así pues, no procede cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones alternativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, y (4) como cuestión de derecho no procede.(54)
Asimismo, hemos resuelto que la sentencia sumaria procede “aunque se hayan alegado hechos que aparenten estar en controversia, pero cuando el promovente logre demostrar preponderantemente, y mediante dicha prueba documental, que en el fondo no existe controversia sobre los hechos medulares”,(55) la sentencia sumaria procederá, si el tribunal concluye que no existen controversias de hechos materiales y esenciales; como cuestión de derecho, debe dictarse la sentencia.
En el presente caso, el Tribunal de Apelaciones entendió que existían varios hechos materiales en controversia, a saber: si hubo aceptación de los términos del financia-miento; si los recurrentes no comparecieron al cierre del contrato de manera unilateral y buscaron evadir el pago de la comisión pactada; si los recurrentes utilizaron la infor-mación y negociación obtenida por el señor Piovanetti Gar-cía para obtener una oferta similar o idéntica con otra ins-titución, y por último, si al momento de los hechos el *776 demandante estaba exento de los requisitos de la ley local para obtener licencia de intermediación financiera, por es-tar inscrito en el NYSE y NASDAQ. Sin embargo, ninguno de estos hechos controvertidos son materiales ni esenciales.
Los primeros tres hechos a los que el foro apelativo in-termedio hace referencia están relacionados con el contrato otorgado, los cuales, a su vez, son inmateriales porque el contrato fue declarado nulo por el Tribunal de Primera Instancia.(56) El foro primario tuvo ante sí no sólo las ale-gaciones de las partes sino que también tuvo el beneficio de contar con prueba documental y deposiciones, con las cua-les pudo constatar la inexistencia de hechos esenciales. Así, con la prueba que surge del expediente resulta razo-nable concluir que el señor Piovanetti García no tenía li-cencia de intermediación financiera, no estaba exento de cumplir con dicho requisito y otorgó un contrato de corre-taje de préstamo sin estar autorizado por ley, lo que anula el contrato. Es esa conclusión a la que llega el foro prima-rio, la cual en ausencia de pasión, prejuicio, parcialidad o error manifiesto goza de nuestra deferencia.
Por su parte, el último hecho controvertido planteado por el Tribunal de Apelaciones —si la inscripción en los mercados de NYSE y NASDAQ le eximía del requisito de obtener una licencia— no es una cuestión de hecho sino de derecho, la cual el Tribunal de Primera Instancia resolvió correctamente en la negativa.
Así pues, luego de examinar rigurosamente el expe-diente del caso de autos, concluimos que así como dicta-minó el Tribunal de Primera Instancia, no queda ningún hecho material en controversia y, como cuestión de dere-cho, procedía que se dictara sentencia sumaria. Por tal ra-zón, el Tribunal de Apelaciones erró al revocar la sentencia *777 sumaria dictada correctamente por el Tribunal de Primera Instancia ante la inexistencia de controversias de hechos materiales y esenciales.
VII
En armonía con lo antes señalado, se revoca la Senten-cia del Tribunal de Apelaciones y se reinstala la Sentencia del Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Rivera Pérez y la Jueza Aso-ciada Señora Fiol Matta no intervinieron. La Jueza Aso-ciada Señora Pabón Chameco no interviene.

 7 L.P.R.A. see. 1071 et seq.

 Ambos matrimonios obtuvieron el financiamiento deseado a través del Banco Bilbao Vizcaya Argentaría (BBVA), esta vez sin la intermediación del señor Piova-netti García.

 32 L.P.R.A. Ap. III.

 Es preciso aclarar que, contrario a lo resuelto por el T.P.I., ambos matrimo-nios realizaron el pago de $35,000 al Banco y no como un adelanto de la comisión del señor Piovanetti García.

 Col. Int’l Sek P.R., Inc. v. Escribá, 135 D.P.R. 647, 655 (1994); J. Puig Brutau, Fundamentos de Derecho Civil, 3ra ed., Barcelona, Ed. Bosch, 1982, T. II, Vol. II, pág. 480.

 Véanse: J. Santos Briz y otros, Tratado de derecho civil: teoría y práctica, Barcelona, Ed. Bosch, 2003, T. IV, pág. 461; R. Uría, Derecho Mercantil, 25ta ed., Madrid, Ed. Marcial Pons, 1998, pág. 751.

 Meléndez Guzmán v. Berrios López, 172 D.P.R. 1010 (2008). Es preciso seña-lar que aunque en el referido caso describimos dicho contrato como bilateral, la doctrina civilista está bastante dividida al respecto. Además, no obstante lo anterior, este Tribunal reconoció en Col. Int’l Sek P.R., Inc. v. Escribá, supra, pág. 655 esc. 12, los supuestos de unilateralidad y bilateralidad del contrato de corretaje al citar con aprobación la posición del tratadista alemán Enneccerus, el cual distingue tres tipos de contrato de corretaje, a saber:
“a) El contrato unilateral de corretaje o puro. El corredor no se obliga a la actividad, y su prestación es únicamente una condición de su derecho a recibir la comisión. Pero esto no excluye que haya de ajustarse a las exigencias de la fidelidad contractual (See. 242), o sea, no le es lícito obrar en contra de los intereses del mandante, tiene que obrar discretamente y no le es lícito abandonar caprichosa-mente y en daño del mandante la actividad voluntariamente comenzada, etcétera, etc.
“b) El contrato bilateral de corretaje, en el cual también el corredor asume una obligación dirigida a indicar la ocasión para concluir un contrato o a mediar en un contrato. Semejante contrato cae ciertamente dentro del concepto del contrato de corretaje, pero es a la vez un contrato de servicios, ya que se promete a título oneroso una actividad (no el resultado), constituyendo, por tanto, una clase especial del con-trato de servicios (contrato de servicios de corredor) al que se aplican, en primer lugar, las disposiciones sobre el contrato de corretaje, pero además, en tanto que de éstas y de la esencia del contrato de corretaje no resulte una especialidad, las dispo-siciones sobre el contrato de servicios.
“c) El contrato bilateral de corretaje (por cierto poco frecuente) por el cual el corredor promete el resultado mismo, por ejemplo, obligándose a proporcionar una hipoteca de una determinada cuantía y bajo determinadas condiciones (intereses, etc.). A este contrato (contrato de obra de corredor) se aplican las disposiciones sobre el contrato de corretaje y, subsidiariamente, las relativas al contrato de obra.” (En-fasis en el original.) L. Enneccerus, Tratado de Derecho Civil, (B. Pérez González y J. Alguer, trads.), Barcelona, Ed. Bosch, 1966, T. II, Vol. 2, pág. 561.

 Meléndez Guzmán v. Berrios López, supra; Col. Int’l Sek P.R., Inc. v. Escribá, supra, págs. 654-655; Dumont v. Inmobiliaria Estado, Inc., 113 D.P.R. 406 (1982); Torres v. Arbona, Jr, 72 D.P.R. 769 (1951). Véase, además, J. Castán Tobeñas, Dere-cho civil español, común y foral, 15ta ed., Madrid, Ed. Reus, 1993, T. IV, pág. 571.

 F. Puig Peña, Tratado de Derecho Civil Español, 2da ed. rev., Madrid, Ed. Revista de Derecho Privado, 1973, T. IV, Vol. II, pág. 413.

 Castán Tobeñas, op. cit., pág. 573.

 Id. Véase, además, Santos Briz, op. cit, pág. 463.

 Meléndez Guzmán v. Berrios López, supra; Santos Briz, op. cit., pág. 462.

 Véase Lamboy v. Irizarry, 73 D.P.R. 331, 333-334 (1952).

 Kock v. Emmerling, 63 U.S. 69 (1859). Véase, además, Crowe v. Trickey, 204 U.S. 228 (1907).

 Uría, op. cit., pág. 752. Además, se ha entendido que la remuneración podría devengarse “siempre que de las gestiones del mediador se haya aprovechado quien concluya el contrato”. íd. Véase Santos Briz, op. cit. De igual forma, el corredor tendría derecho a la remuneración “ls]i ha habido un principio de ejecución del ne-gocio mediado y luego se interrumpe por el oferente” y “si la conclusión del negocio mediado ha sido impedido por el oferente”. J.M. Martínez Val, Derecho Mercantil, Barcelona, Ed. Bosch, 1979, pág. 490.

 Marcano v. Departamento Estado, 163 D.P.R. 778, 786 (2005); Román v. Trib. Exam. de Médicos, 116 D.P.R. 71, 77 (1985).

 Véase Exposición de Motivos de la Ley Núm. 214 de 14 de octubre de 1995, (Parte 1) Leyes de Puerto Rico 1153.

 íd.

 íd.

 íd.

 La obligación antecedida surge del Art. 4 de la Ley Núm. 214, supra, 7 L.P.R.A. see. 1073, el cual dispone:
“Ninguna persona, excepto las excluidas de la aplicabilidad de este capítulo, los bancos autorizados a operar en Puerto Rico, compañías de fideicomisos, agencias federales o dependencias del Estado Libre Asociado de Puerto Rico, cooperativas de ahorro y crédito, sistemas de retiro gubernamentales, asociaciones de ahorros y prés-tamos federales, compañías de seguros autorizadas por el Secretario de Hacienda a hacer negocios en Puerto Rico y personas naturales que concedan préstamos o finan-ciamientos con un volumen combinado de negocios anual que no exceda de diez mil (10,000) dólares, podrá dedicarse al “Negocio de Intermediación Financiera’ sin antes obtener una licencia expedida por el Comisionado, conforme a lo dispuesto en este capítulo.”

 Arts. 5 y 7 de la Ley Núm. 214, supra, 7 L.P.R.A. sees. 1074 y 1076.

 8 de la Ley Núm. 214 (7 L.P.R.A. see. 1077). “La obligación de prestar fianza provee una salvaguarda para proteger los derechos de los consumidores, en caso de que el concesionario faltare en el cumplimiento de sus obligaciones para con el cliente.” Informe de la Comisión de Asuntos del Consumidor de la Cámara de Representantes sobre el P. de la C. 2091 de 30 de agosto de 1995, 8va Sesión Ex-traordinaria, 12ma Asamblea Legislativa, pág. 2.

 Arts. 11 y 18 de la Ley Núm. 214, supra, 7 L.P.R.A. sees. 1080 y 1087.

 7 L.P.R.A. sec. 1071(a).

 7 L.P.R.A. see. 1072.

 Por ejemplo, los servicios de planificación financiera están incluidos tanto en la definición de negocio de intermediación financiera provista en la Ley Núm. 214 como en la definición de asesor de inversiones del Art. 401(f) de la Ley Uniforme de *765 Valores. Por ende, los asesores financieros, entre otros, ya están regulados por la Ley Uniforme de Valores. 10 L.P.R.A. see. 881.

 Cabe señalar que cuando se aprobó la Ley Núm. 214 los economistas no estaban incluidos en la referida exclusión. Sin embargo, a través de la Ley Núm. 125 de 21 julio de 2000 se enmendó el inciso (a) del Art. 2 de la Ley Núm. 214 para añadir a los economistas entre los profesionales exentos. El legislador entendió que los economistas prestan servicios de intermediación financiera de forma incidental al ejercicio de su profesión, por consiguiente, en reconocimiento de la labor que éstos desempeñan en ciertas circunstancias, se les incluyó junto a los profesionales cubier-tos por la exclusión limitada. Véase Exposición de Motivos de la Ley Núm. 125 de 21 julio de 2000, (Parte 1) Leyes de Puerto Rico 899.

 Informe de la Comisión de Asuntos del Consumidor de la Cámara de Repre-sentantes, supra, pág. 3.

 7 L.P.R.A. sec. 1071(d).

 Reglamento de Intermediación Financiera (Reglamento de O.C.I.F. Núm. 5721), de 20 de noviembre de 1997. Dicho reglamento fue enmendado por el Regla-mento Núm. 6535 de 21 de octubre de 2002, para disponer que su aplicación fuera permanente, pues el Reglamento Núm. 5721 tenía vigencia de 5 años a partir de su aprobación.

 Reglamento de Intermediación Financiera, Art. 3(1), pág. 1.

 íd., Art. 4(5), pág. 2.

 Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14.

 Romero Barceló v. E.L.A., 169 D.P.R. 460, 476-477 (2006).

 íd.

 31 L.P.R.A. sec. 19.

 Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230 (2009).

 Véase Rosario Mercado v. Comisión Industrial, 85 D.P.R. 336, 342 (1962).

 Véase Informe de la Comisión de Asuntos del Consumidor de la Cámara de Representantes, supra, pág. 2.

 Véanse: Oposición a sentencia sumaria, pág. 1 esc. 1, Apéndice de la Oposi-ción de certiorari, pág. 58, Caso Núm. CC-2009-0229 (2da pieza); Escrito de apela-ción, pág. 2 esc. 5 (presentado al Tribunal de Apelaciones), Apéndice de la Petición de certiorari, pág. 51, Caso Núm. CC-2009-0229 (Ira pieza), y Oposición al certiorari, pág. 2 esc. 5, Caso Núm. CC-2009-0229 (2da pieza), presentado ante este Tribunal.

 íd.

5) Art. 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3391.

 Art. 1226 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3431.

6) Véanse: Art. 1227 y Art. 1228 del Código Civil, 31 L.P.R.A. sees. 3432 y 3433.

 Art. 1227, supra.

 Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 182 (1985).

 Col. Int’l Sek P.R., Inc. v. Escriba, supra, pág. 666. Véase, además, G.E. Palmer, The Law of Restitution, Boston, Ed. Little, Brown and Co., 1978, Vol. II, Sec. 8.3, págs. 180-187.

 Ramos Pérez v. Univisión, 178 D.P.R. 200 (2010); Toro Avilés v. P.R. Telephone Co., 177 D.P.R. 369 (2009); Gonzalez Aristud v. Hosp. Pavia, 168 D.P.R. 127, 137 (2006).

 González Aristud v. Hosp. Pavia, supra.

 Regla 36.5 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill; Toro Avilés v. Puerto Rico Telephone Co., supra.

 íd.; González Aristud v. Hosp. Pavia, supra, pág. 138.

 Regla 36.3 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III.

 Echandi Otero v. Stewart Title, 174 D.P.R. 353 (2008).

 Jusino et als. v. Walgreens, 155 D.P.R. 560, 577 (2001). Véase R. Hernández Colón, Práctica jurídica de Puerto Rico: derecho procesal civil, 4ta ed., San Juan, Ed. LexisNexis de Puerto Rico, 2007, pág. 237.

 Cabe señalar que el Tribunal de Apelaciones no evaluó dicha determinación del foro primario en los méritos porque se concentró solamente en lo relacionado al dictamen de sentencia sumaria.